[Civ. No. 36270. First Dist., Div. Four. Apr. 2, 1976.]

INTERNATIONAL ASSOCIATION OF FIRE FIGHTERS UNION, LOCAL 1974, AFL-CIO, Plaintiff and Appellant, v. CITY OF PLEASANTON et al., Defendants and Respondents.

960

COUNSEL

Davis, Cowell & Bowe, Alan C. Davis and David J. Salniker for Plaintiff and Appellant.

Kenneth C. Scheidig, City Attorney, for Defendants and Respondents.

OPINION

RATTIGAN, Acting P. J.—International Association of Fire Fighters Union Local 1974, AFL-CIO, a labor union (hereinafter "appellant union," or "union") appeals from a judgment entered in its action against respondents (the City of Pleasanton, its city manager, and the members of its city council). The appeal challenges the judgment insofar as it reflects the trial court's determination that legislative action taken by the city council, affecting city personnel represented by the union, is valid despite the city's previous failure to have complied with certain provisions of the Meyers-Milias-Brown Act (hereinafter the "M-M-B Act," or the "Act").[1]

FACTS

The issues in the cause were joined upon the union's complaint, respondents' answer, and extensive declarations filed by both sides. By

---

[1]Except where otherwise expressly indicated, all statutory references herein are to the M-M-B Act. (Gov. Code, div. 4 ["Public Officers and Employees"], ch. 10 ["Local Public Employee Organizations," commencing with § 3500].)

stipulation, it was submitted for decision upon these documents and other evidence, both oral and documentary, received at a hearing upon the union's application for a preliminary injunction. That evidence supports the following summary:

At all pertinent times since 1970, the union has been the "recognized employee organization" representing all of the city's fire service employees, except for the fire chief, pursuant to sections 3501, 3502, and 3503 of the M-M-B Act.[2] By formal action taken on April 5, 1971, the city council adopted a three-part legislative package entitled "Personnel Manual," or "Personnel Rules." Part I was City Ordinance No. 626 (entitled "Personnel Ordinance"). Part II was Council Resolution 71-73 (". . . Personnel Rules and Regulations"). Part III consisted of Resolutions 71-74 ("Employer And Employee Relations Procedures") and 71-75 ("Rules Supplementing Those In Resolution 71-74 Relating To Employer and Employee Relations").

Following the adoption of the "Personnel Manual," and pursuant to procedures prescribed therein, representatives of the city and the union negotiated an agreement relating to the salaries of the fire service employees represented by the union (including fire captains and the fire prevention officer), and other matters affecting such employees, for a

---

[2]Section 3501 provides in pertinent part:

"3501. As used in this chapter [i.e., in the M-M-B Act]:

"(a) 'Employee organization' means any organization which includes employees of a public agency and which has as one of its primary purposes representing such employees in their relations with that public agency.

"(b) 'Recognized employee organization' means an employee organization which has been formally acknowledged by the public agency as an employee organization that represents employees of the public agency.

"(c) . . . '[P]ublic agency' means every . . . city . . . .

"(d) 'Public employee' means any person employed by any public agency, including employees of the fire departments and fire services of . . . cities . . . ."

The other two sections here cited provide, in full respectively:

"3502. Except as otherwise provided by the Legislature, public employees shall have the right to form, join, and participate in the activities of employee organizations of their own choosing for the purpose of representation on all matters of employer-employee relations. Public employees also shall have the right to refuse to join or participate in the activities of employee organizations and shall have the right to represent themselves individually in their employment relations with the public agency.

"3503. Recognized employee organizations shall have the right to represent their members in their employment relations with public agencies. Employee organizations may establish reasonable restrictions regarding who may join and may make reasonable provisions for the dismissal of individuals from membership. Nothing in this section shall prohibit any employee from appearing in his own behalf in his employment relations with the public agency."

two-year term covering the fiscal years 1971-1972 and 1972-1973. The agreement was reduced to writing in the form of a "Memorandum Of Understanding" which was executed on behalf of the parties, accepted by the city council, and took effect July 1, 1971.

On and after April 25, 1973, meetings were held between representatives of the union and the city for the purpose of negotiating a new agreement for the upcoming 1973-1974 fiscal year which was to commence July 1, 1973. The meetings resulted in an agreement between the union and the city on the wages, hours and working conditions of all of the city's fire service employees, including fire captains and the fire prevention officer, for the new fiscal year. The agreement was to take effect July 1, 1973, thus succeeding the aforementioned two-year agreement in point of time. It was similarly reduced to writing in the form of a "Memorandum Of Understanding." It was executed by union representatives and the city manager, and was accepted by the city in a resolution adopted by the city council, in late June 1973.

Meanwhile, the city had developed proposals for amendment of its 1971 "Personnel Manual" in certain respects. The substance of the proposed amendments was drafted into a memorandum prepared by a member of the city manager's staff. (We hereinafter refer to this document as the "staff memorandum.") A copy of the staff memorandum was delivered to the union. Its contents were subsequently discussed, between representatives of the union and the city, on at least two occasions. (See fn. 8, *post.*) The union expressed its approval of some of the proposals on these occasions, and its disapproval of others, but the city did not at any time submit the proposals to them as subjects for negotiation; the city's stated position was that its unilateral adoption of the proposed amendments was in order because they were strictly "management prerogatives."

The amendments were included in Resolution 73-111, which was presented for action at a meeting of the city council held on June 25, 1973. Union representatives appeared at the meeting and objected to the resolution upon the grounds subsequently asserted by the union in this action. The council, adhering to the city's "management prerogative" position, adopted Resolution 73-111 over the union's objection.

As adopted, and as now pertinent, Resolution 73-111 amended provisions of the 1971 "Personnel Manual" relative to (1) the definition

of an employee "grievance," (2) pay for sick leave earned by an employee but not actually taken, (3) "educational incentive pay," (4) the procedure whereby the city announced competitive examinations for employment, (5) the time at which an employee serving an initial 12-month probationary period would be eligible for a nonautomatic "merit pay increase" and (6) the reclassification of employees holding the positions of "Fire Captain" and "Fire Prevention Officer" as "Middle Management" employees of the city. (Some specifics of the last three of these amendments, and of their respective factual contexts and effects, are hereinafter recited.)

*The Litigation*

The union thereupon commenced the present action against respondents, seeking injunctive and mandatory relief against the six provisions of Resolution 73-111 enumerated above. After the issues had been joined, heard and submitted, the trial court filed a detailed memorandum decision ("Statement Of Intended Decision") indicating that injunctive relief would be granted in some of the respects prayed by the union and that relief would be denied in others. The court thereupon entered a judgment, without making formal findings of fact and conclusions of law.[3]

Pursuant to the court's memorandum decision, paragraph "1." of the judgment enjoins the city from implementing Resolution 73-111 in the first three respects challenged by the union (the amendments relative to the definition of "grievance," payment for unused sick leave, and "educational incentive pay").[4] Paragraph "2." of the judgment denies relief in the fourth, fifth and sixth respects (the amendments affecting the city's announcement of examinations for employment, the timing of "merit pay increases" for probationary employees, and the reclassification of the positions of "Fire Captain" and "Fire Prevention Officer" as "Middle Management" employees of the city).

Appealing from the judgment insofar as it denies relief as to the last three amendments (see fn. 15, *post*), the union contends that their

[3]Findings and conclusions were omitted because no party requested them. (See Code Civ. Proc., § 632; rule 232(b), Cal. Rules of Court.)

[4]Paragraph "1." of the judgment enjoins the city from "implementing, enforcing, or giving effect" to the sections of Resolution 73-111, which pertain to these three subjects, "to the extent said sections pertain to fire fighters employed by the City of Pleasanton."

unilateral adoption in Resolution 73-111 was void for the city's failure to have complied with the provisions of the M-M-B Act next identified.

Section 3504.5 of the M-M-B Act required the city to give "reasonable written notice" to the union, as a "recognized employee organization," of any proposal for legislative action "directly relating to matters within the scope of representation."[5] The first paragraph of section 3505 further required the city to "meet and confer in good faith" with representatives of the union, concerning "wages, hours, and other terms and conditions of employment" of the personnel represented by the union; according to the section's second paragraph in which the term "meet and confer in good faith" is defined, the city's obligation to do this extended to "matters within the scope of representation."[6] The recurrent term "scope of representation" is defined in section 3504 to include—with a specified exception not pertinent here—*all* matters affecting the employer-employee relationship, "including, but not limited to, wages, hours, and other terms and conditions of employment."[7]

[5]Section 3504.5 provides in pertinent part: ". . . [T]he governing body of a public agency, and boards and commissions designated by law or by such governing body, shall give reasonable written notice to each recognized employee organization affected of any ordinance, rule, resolution, or régulation directly relating to matters within the scope of representation proposed to be adopted by the governing body or such boards and commissions and shall give such recognized employee organization the opportunity to meet with the governing body or such boards and commissions. . . ."

[6]Section 3505 states: "[¶] The governing body of a public agency, or such boards, commissions, administrative officers or other representatives as may be properly designated by law or by such governing body, shall *meet and confer in good faith regarding wages, hours, and other terms and conditions of employment* with representatives of such recognized employee organizations, as defined in subdivision (b) of Section 3501 [see fn. 1, *ante*], and shall consider fully such presentations as are made by the employee organization on behalf of its members prior to arriving at a determination of policy or course of action.

" 'Meet and confer in good faith' means that a public agency, or such representatives as it may designate, and representatives of recognized employee organizations, shall have the mutual obligation personally to meet and confer promptly upon request by either party and continue for a reasonable period of time in order to exchange freely information, opinions, and proposals, and to endeavor to reach agreement on *matters within the scope of representation* prior to the adoption by the public agency of its final budget for the ensuing year. The process should include adequate time for the resolution of impasses where specific procedures for such resolution are contained in local rule, regulation or ordinance, or when such procedures are utilized by mutual consent." (Italics added.)

[7]Section 3504 provides: "The scope of representation shall include all matters relating to employment conditions and employer-employee relations, including, but not limited to, wages, hours, and other terms and conditions of employment, except, however, that the scope of representation shall not include consideration of the merits, necessity, or organization of any service or activity provided by law or executive order."

It first appears that the trial court sustained the union's contentions that the city had *in fact* failed to give notice to the union in compliance with section 3504.5, and to "meet and confer in good faith" with the union's representatives as contemplated in section 3505, concerning any of the above-enumerated amendments proposed for adoption in Resolution 73-111.[8] It further appears that, having determined this fact, the court denied relief against the fourth and fifth amendments thus adopted (relative to the announcement of "examinations" and the eligibility of probationary employees for "merit pay increases") upon the ground that neither of them pertained to "wages, hours, and other terms and conditions of employment" (§ 3505), or to matters within "the scope of representation" (*id.,* and § 3504), or either, so as to require the city to engage in a "meet and confer" procedure with the union, pursuant to section 3505, before adopting either amendment.

The standards controlling our review of the trial court's action in these respects have been established. In the first place, the courts have not been reluctant to intervene "when a public agency has taken unilateral action without bargaining at all. In such situations, courts have been quite zealous in condemning the unilateral action and in granting appropriate relief." (Grodin, *Public Employee Bargaining in California: The Meyers-Milias-Brown Act In The Courts* (1972) 23 Hastings L.J. 719, 753-754.) Moreover:

"Section 3503 establishes the right of recognized employee unions directly to represent their members in 'employment relations with public

---

[8]As we have seen, there was evidence that the proposed amendments, which were finally adopted in Resolution 73-111, were communicated to the union, in writing, at least two months before the resolution was adopted in June 1973. There was also evidence that all of the proposals were discussed at a meeting which was called for that purpose and which was attended by representatives of the union and a representative of the city; and that the proposal for reclassification of "Fire Captain" and "Fire Prevention Officer" as "Middle Management" positions was discussed at one of the meetings which produced the "Memorandum Of Understanding" covering the 1973-1974 fiscal year. It also appears that the latter meetings were conducted for the purpose of negotiating that agreement, as "meet and confer" sessions pursuant to section 3505. (See fn. 6, *ante.*) The possibility that the city *did* give notice of the various proposals to the union, and that it *did* "meet and confer in good faith" with union representatives concerning them, was accordingly suggested to the trial court. Despite the absence of findings on either subject (see fn. 3 and the accompanying text, *ante*), it is clear from the memorandum decision that the court determined to the contrary in both respects. We have resorted to the memorandum decision, as we may do, for the purpose of ascertaining the process by which the trial court reached its decision. (See *Niles Sand & Gravel Co.* v. *Alameda County Water Dist.* (1974) 37 Cal.App.3d 924, 933 [fn. 10] [112 Cal.Rptr. 846] and authorities there cited.)

agencies.' This right to representation reaches '*all* matters of employer-employee relations,' (Gov. Code, § 3502; italics added) and encompasses 'but [is] not limited to wages, hours, and other terms and conditions of employment' (Gov. Code, § 3504)." (*Social Workers' Union, Local 535* v. *Alameda County Welfare Dept.* (1974) 11 Cal.3d 382, 388 [113 Cal.Rptr. 461, 521 P.2d 453] [Original italics; fn. omitted. For the texts of the M-M-B Act sections cited, see fn. 2, *ante*].) The M-M-B Act thus "defines the *scope* of the employee's right to union representation in language that is broad and generous." (*Ibid.* [Original italics].) ■ The phrase "wages, hours, and other terms and conditions of employment" is to be liberally construed, consistent with the "generous interpretation" which has been accorded it in decisions dealing with the federal law from which it has been incorporated into the M-M-B Act. (*Id.,* at p. 391.)

The Act is also to be construed in light of its purposes, which are stated in section 3500 as follows: "It is the purpose of this chapter [i.e., of the Act] *to promote full communication between public employers and their employees* by providing a reasonable method of resolving disputes regarding wages, hours, and other terms and conditions of employment between public employers and public employee organizations. It is also the purpose of this chapter to promote the improvement of personnel management and employer-employee relations within the various public agencies in the State of California by providing a uniform basis for recognizing the right of public employees to join organizations of their own choice and be represented by such organizations in their employment relationships with public agencies. . . ." (Italics added.)

*The Amendment Relative to the*
*Announcement of "Examinations"*

The original provision of the "Personnel Manual" on this subject appeared in section 601 (entitled "Announcement" and hereinafter cited as "section 601") of the "Rules and Regulations" adopted in Resolution 71-73. The original text of section 601 read: "All examinations for classes in the competitive service shall be publicized by posting announcements a minimum of 15 days in advance in the City Hall, on official bulletin boards, and by such other methods as [the city's] Personnel Officer deems advisable. The announcements shall specify the title and pay of the class for which the examination is announced, preparation desirable for the performance of the work of the class, the manner of making

application, minimum requirements and qualifications for the class, conditions of employment if any and other pertinent information."

Section 2 of Resolution 73-111 amended section 601 to read as follows:

"All examinations for classes in the competitive service shall be publicized by the Personnel Officer by whatever means and for whatever duration of time the Personnel Officer deems advisable prior to the holding of an examination. The Personnel Officer in making his determination as to the manner and duration of announcing an examination shall take into consideration the position to be filled, the number of applications on file with the City and such other factors as will insure a sufficient number of applicants for the position. . . . [The third and final sentence of the amended section reiterated its original second sentence, quoted above, without change.] . . ."

In its memorandum decision (see fn. 8, *ante*), the trial court discussed and disposed of the section 601 amendment in this language: "Plaintiff [union] says the safety of fire fighters is involved, that hiring and filling of vacancies at any level relates to conditions of . . . employment. Basic to this argument is the premise expressed by plaintiff that the changed method 'inevitably results in the hiring of employees who are unqualified.' Safety is surely of prime importance but no evidence convinces the Court that the premise that unqualified employees will be hired is true. The uncontradicted evidence was that many more than required take the examinations. Reasonable steps to reduce that number without lowering employee quality seem proper.[9] . . . [¶] The Court finds the City's action proper re announcement of examinations."

The court thus rejected the union's arguments that the amendment portended the "hiring of employees who are unqualified" and that it was accordingly within "the scope of representation" as defined in section 3504 (see fn. 7, *ante*) and subject to the "meet and confer" requirements of section 3505 (fn. 6), because it pertained to the represented employees' "safety" conceived as a pertinent "condition[] of employment." (§ 3504.)

[9]These two sentences obviously refer to the reason for the proposed amendment as stated in the staff memorandum. "In recent years, the number of qualified applicants for most positions in the competitive service has become astronomical. For example, for positions of Policeman or Fireman we will administer examinations to normally 250 to 300 individuals. Testing these many individuals is of no real value to the City." The author of the memorandum therefore recommended the amendment later adopted, for the stated reason that "the number of applicants tested could be reduced to a more appropriate and workable number."

The court also determined that the amendment was "[r]easonable." (See the text at fn. 9, *ante.*)

We first conclude that the latter determination does not command validation, of the amendment of section 601, because it is irrelevant. The question is not whether the amendment is "reasonable" or was effected for good cause, nor even whether the city was empowered to adopt it over objections expressed by the union in a "meet and confer" procedure. The issue is whether the M-M-B Act permitted the city to adopt it, unilaterally, *in the absence* of such procedure.

It appears that the trial court properly rejected the union's "safety" argument, and the "unqualified employee" consequences claimed for the amendment of section 601, as unsupported by the evidence. We nevertheless conclude that the amendment has further consequences that brought it within the "scope of representation" (§ 3504) and, accordingly, within the "meet and confer" requirements of section 3505. The reason for the amendment as stated in the city manager's staff memorandum, and the trial court's review of it, were addressed exclusively to the announcement of "examinations" to be given prospective employees who propose to enter the employ of the city for the first time and whose numbers had become unmanageable for examination purposes. (See fn. 9 and the accompanying text, *ante.*) The "examinations" actually involved are not limited to applicants for first-time employment. We refer to the following sections of Resolution 71-73, none of which was amended by Resolution 73-111 (and all of which were apparently overlooked below):

Section 111 defines four different types of "Examination[s]": "Open Competitive," "Promotional," "Continuous," and "Open-Promotional." Eligibility to take at least two of these (the "Promotional" and "Open-Promotional" types) is expressly limited by section 111 to *present employees* of the city ("permanent employees" who "meet the qualifications" for the prospective position in the one case, "permanent and probationary employees" with the requisite "qualifications" in the other), who seek *promotion* as distinguished from initial employment.

Section 118 defines "[p]romotion" as "[t]he movement of an employee from one class to another class having a higher maximum rate of pay." Section 105 defines a "[c]lass" as an identifiable "grouping" of employees. All of these sections pertain to positions in the city's "competitive service[s]," which section 107 defines to include all city employees except

a limited number whose positions are "excluded" from the definition, by section 107 itself, and are named among the few "exempt services" positions listed in section 1912. Section 1302 provides that "[i]nsofar as consistent with the best interests of the service *all* vacancies in the competitive service shall be filled *by promotion from within the competitive service after a promotional examination has been given. . . .*" (Italics added.)

■ In sum, these provisions of Resolution 71-73 establish that "examinations" of the "Promotional" and "Open-Promotional" types, at least, are of vital interest to *present* city employees who may advance in class by "promotion" and who are given preference in the filling of positions higher in "class" than those they hold. Such employees are included among those represented by the union.

The amendment of section 601 abolishes the 15-day, bulletin board announcement of *all* "examinations," without distinction, and commits the manner and duration of *all* announcements thereof to the unfettered discretion of the personnel officer. The prospect that examinations of such importance to present employees of the city might be conducted after wholly ineffective "announcement" may or may not be a real likelihood. However, the importance of the "announcements" to the employees represented by the union, in light of the above-summarized sections of Resolution 71-73 which were not amended, is such that a substantial change in the procedure to be followed is an equally important "condition of employment" according to the broad meaning of the term as used in the M-M-B Act and the liberal judicial construction required of it. (*Social Workers' Union, Local 535* v. *Alameda County Welfare Dept., supra,* 11 Cal.3d 382 at pp. 389-392.) We therefore conclude that section 3505 of the M-M-B Act (see fn. 6, *ante*) obligated the city to "meet and confer in good faith" with representatives of the union, and to discuss the proposed amendment, before proceeding with its adoption in Resolution 73-111.

*The Amendment Relative to Probationary
Employees' Eligibility for "Merit Pay Increases"*

The original provision of the "Personnel Manual" on this subject appeared in section 1203 (entitled "Advancement" and hereinafter cited as "section 1203") of the "Rules and Regulations" adopted in Resolution 71-73. Section 3 of Resolution 73-111 amended section 1203, by adding a

third sentence to its original two-sentence text, to make it read as follows (amendatory language italicized):

"No salary advancement shall be made so as to exceed any maximum rate established in the pay plan for the class to which the advanced employee's position is allocated. Advancements shall not be automatic but shall depend upon increased service value of an employee to the City as exemplified by recommendations of his supervising official, length of service, performance, record, special training undertaken, or other pertinent evidence, within the advancement policy established by the pay plan. *Any employee subject to a twelve month probationary period shall not normally be eligible for advancement in pay until he has successfully completed said probationary period, or any extension thereof, as provided in Section 1001 of these Rules and Regulations* [i.e., of Resolution 71-73]."[10]

The obvious effect of the amendment of this section is to make a new employee of the city "normally" ineligible for any increase in pay during the 12-month probationary period he must serve under his "original appointment" to employment. (See fn. 10, *ante*.) Disposing of the amendment in its memorandum decision (see fn. 8, *ante*), the trial court stated in part: "*Nothing previously enacted provided for any shorter period before a pay increase.* Section 1203 as it read before the amendment said, and still says, that advancement [in pay] is not automatic. . . . Since it does not change an existing agreement or rule and does not change the probationary period, [the] City can properly adopt the . . . [amendment] . . . without notice." (Original italics.)

■ The court was correct in concluding that the amendment did not "change an existing agreement or rule," neither of which is shown in the evidence. However, the staff memorandum (in which the amendment was recommended) unconditionally stated that a new city employee was and had been, at the time of the recommendation, "eligible for a merit increase [in salary] *after six months employment with the City,* assuming his performance warrants said increase." (Italics added.) No evidence has been cited, nor have we perceived any, which controverts this statement. It thus appears that, although the amendment did not "change an existing agreement or rule," it halted an existing and acknowledged *practice.*

---

[10]Section 1001 of Resolution 71-73 states in pertinent part: "All *original* appointments shall be tentative and subject to a probationary period of *twelve months* actual service. All *promotional* appointments shall be tentative and subject to a probationary period of *six months* actual service." (Italics added.)

Because the practice was of material significance to 12-month probationary employees (some of whom are represented by the union), the amendment which terminates it is equally significant.[11] Moreover, its subject matter—the timing of eligibility for a prospective if not automatic, salary increase—pertains directly to the affected employees' "wages" as that term is used in sections 3504 and 3505. (See fns. 7 and 6, *ante.*) We again conclude that section 3505 of the M-M-B Act (see fn. 6, *ante*) required the city to "meet and confer in good faith" with representatives of the union, and to discuss the proposed amendment, before adopting it in Resolution 73-111.

*The Amendment Classifying "Fire*
*Captain" and "Fire Prevention Officer"*
*as "Middle Management" Positions*

As adopted in 1971, Resolution 71-74 included a page labelled "Exhibit 'A'."[12] It designated the city's "Management And Confidential Employees" by showing their positions in two lists respectively captioned "Management and Confidential Position Class" and "Confidential." The only position in the city's fire service shown on either list was that of "Fire Chief," which appeared in the "Management and Confidential Position Class."

Section 10 of Resolution 71-74 (entitled "Appropriate Unit[s]") pertained to the establishment of "units" for the representation of specific employee groups. In section 10(D), the city "recognized," as "appropriate units," (1) its fire service employees and (2) all other employees. Section 10(B) provided in part that "management and confidential employees who are included in the same unit with non-management or non-confidential employees may not represent such employees on matters within the scope of representation."

[11]The city contends that the amendment will affect only "new employees." Resolution 73-111, as adopted June 25, 1973, provides that it shall take effect immediately. The amendment could therefore affect a "new employee" who was then serving the first six months of his 12-month probationary period. The amendment contains no future operative date which would defer its effect to "new employees" *hired* in the future.

[12]In an aside to the parties, we note that the exhibit actually appears in evidence as the last numbered page of Resolution 71-75. However, its full title ("Exhibit 'A' Employee & Employer Relations Procedure") paraphrases the title of Resolution 71-74. Both resolutions are bound together as Part III of the "Personnel Rules." For these reasons, and because the city council subsequently treated it as an exhibit to Resolution 71-74 (when it amended the latter in Resolution 73-111, as will appear), we also treat it as part of Resolution 71-74.

It is undisputed that the designation of the city's "Management and Confidential Employees" in Exhibit "A" to Resolution 71-74, and the above-quoted provisions of section 10(B) thereof, were effected by the city upon the authority of section 3507.5 of the M-M-B Act.[13]

Resolution 73-111, adopted in 1973, did not amend sections 10(B) or 10(D) of Resolution 71-74. It did amend Exhibit "A" thereto so as to break down the listing of the city's "Management And Confidential Employees" into three categories respectively designated "Top Management," "Middle Management," and "Confidential." In the amended lists, the position of "Fire Chief" appeared in the "Top Management" category. Two more positions in the city's fire service were shown on the "Middle Management" list.

It is again undisputed that these amendments were adopted upon the authority of section 3507.5. (See fn. 13, *ante.*) It is also undisputed that the effect of the classification of the "Fire Captain" and "Fire Prevention Officer" positions as "Middle Management," in light of the unamended provisions of sections 10(B) and 10(D) as quoted or summarized above, was to bar individuals holding these positions from personally representing "non-management or non-confidential employees" in the fire service on matters within the scope of representation." (We here quote § 10(B) of Resolution 71-74.)

In both defining and resolving the question whether the nature of the classification amendment required the city to engage in a "meet and confer" procedure with representatives of the union before adopting it, the trial court read section 3505.5 with section 3507[14] and stated in its memorandum decision (bracketed numerals added for reference):

---

[13] "3507.5. In addition to those rules and regulations a public agency may adopt pursuant to and in the same manner as in Section 3507, any such agency may adopt reasonable rules and regulations providing for designation of the management and confidential employees of the public agency and restricting such employees from representing any employee organization, which represents other employees of the public agency, on matters within the scope of representation. Except as specifically provided otherwise in this chapter, this section does not otherwise limit the right of employees to be members of and to hold office in an employee organization."

[14] As pertinent, section 3507 provides: "[¶] A public agency may adopt reasonable rules and regulations *after consultation in good faith* with representatives of an employee organization or organizations for the administration of employer-employee relations under this chapter (commencing with Section 3500).

"Such rules and regulations may include provisions for (a) verifying that an organization does in fact represent employees of the public agency (b) verifying the

"[1] Section 3507 provides for certain things which can be adopted only after 'consultation in good faith' with the Union. [¶] Section 3507.5 then seems to provide that in addition to the rules and regulations a public agency may adopt under [section] 3507, it may adopt reasonable rules and regulations as therein provided. Why the words ' . . . and in the same manner . . .'? The placement of commas and the words used do *not* indicate that the rules and regulations concerning classification of employees are to be enacted pursuant to Section 3507. Had it been the legislative intent to include the classification authority as requiring [section] 3507 procedures the Legislature could have said so. [¶] The Court cannot add what the Legislature did not provide.

"[2] In addition to the authority granted under Section 3507, the Legislature granted the authority to reclassify employees reasonably. The new authority does not call for its exercise pursuant to the procedures of Section 3507. Clause (i) of the subject matter of Section 3507 (i.e., '(i) such other matters as are necessary to carry out the provisions of this chapter.') which may be contained in rules and regulations adopted following consultation in good faith does not include the designation as management employees. Had it been so included Section 3507.5 would not have been needed.

"The Court finds that the authority to classify employees as management or confidential employees is not required to be exercised pursuant to the provisions of Section 3507."

 We respectfully disagree with point No. 1 because it ascribes no meaning at all to the phrase "and in the same manner as in Section 3507," as used in section 3507.5. The prefatory clause of section 3507.5 is concededly ambiguous, but the words are there. ██ We must presume that "every word, phrase and provision employed in a statute is intended to have meaning and to perform a useful function." (*Clements*

official status of employee organization officers and representatives (c) recognition of employee organizations (d) exclusive recognition of employee organizations formally recognized pursuant to a vote of the employees of the agency or an appropriate unit thereof, subject to the right of an employee to represent himself as provided in Section 3502 (e) additional procedures for the resolution of disputes involving wages, hours and other terms and conditions of employment (f) access of employee organization officers and representatives to work locations (g) use of official bulletin boards and other means of communication by employee organizations (h) furnishing nonconfidential information pertaining to employment relations to employee organizations (i) such other matters as are necessary to carry out the purposes of this chapter. . . ." (Italics added.)

v. *T. R. Bechtel Co.* (1954) 43 Cal.2d 227, 233 [273 P.2d 5]; *California State Employees' Assn.* v. *State Personnel Bd.* (1973) 31 Cal.App.3d 1009, 1013 [108 Cal.Rptr. 57].) In our view, the ambiguity of the prefatory clause is to be attributed to inartful draftsmanship. This means that the clause must be interpreted consistent with the purpose of the entire act (cf. *Gibbons & Reed Co.* v. *Dept. of Motor Vehicles* (1963) 220 Cal.App.2d 277, 286 [33 Cal.Rptr. 688]), which is "to promote full communication between public employers and their employees . . . ." (§ 3500, quoted *ante.*) ▉ Accordingly, and while it is true that a "court cannot add what the Legislature did not provide," as the trial court put it (Code Civ. Proc., § 1858), we conclude that the Legislature *did* provide in section 3507.5 that the "rules and regulations" it authorizes are to be adopted "after consultation in good faith": i.e., "in the same manner as in Section 3507."

We further disagree with the trial court's second conclusion (quoted *ante*) to the effect that the comprehensive language of section 3507, subdivision (i), should be deemed controlling in the interpretation of the prefatory clause of section 3507.5. The former, read in its full context, is a general provision; the latter is specific. Both are therefore to be given effect if possible, and the specific will control against the general only if they are essentially inconsistent. (Code Civ. Proc., § 1859.) The two provisions are not inconsistent as they read: the reference to "Section 3507," in the prefatory clause of section 3507.5, reflects an attempt— however inartful—to reconcile them by requiring a procedure common to both. Our interpretation of section 3507.5 also reconciles both provisions.

We perceive no basis for distinguishing between the term "consultation in good faith," as used in section 3507, and the "meet and confer in good faith" process defined in section 3505. It therefore appears that the city was obligated to engage in the process with representatives of the union, concerning the classification amendment, before adopting it in Resolution 73-111.

Having reached this conclusion as to all three amendments challenged on the appeal, reversal of the judgment in all three respects is required.[15]

---

[15]The appeal is nominally taken from the judgment in its entirety but, as previously indicated in the text, it reaches it only in the three respects mentioned. The bifurcated language of the dispositive paragraph of this decision is accordingly indicated.

(Cf. *Dublin Professional Firefighters, Local 1885* v. *Valley Community Services Dist.* (1975) 45 Cal.App.3d 116, 118-119 [119 Cal.Rptr. 182].)

The parties have ranged much further afield in their briefs, debating such additional questions as whether the classification amendment was adopted in violation of the city's "Personnel Rules," whether it is "reasonable" on its merits, and the effect of a companion resolution which pertained to the same "Middle Management" subject matter. As we have concluded that all of the challenged amendments adopted in Resolution 73-111 are void for procedural violation of the M-M-B Act, we need not consider these additional questions.

As to those matters covered in its paragraph "1.," the judgment is affirmed. As to those matters covered in its paragraph "2.," the judgment is reversed. In the latter respect, the cause is remanded to the trial court with directions to grant injunctive relief as prayed. Appellant shall recover its costs on appeal.

Christian, J., and Emerson, J.,* concurred.

Respondents' petition for a hearing by the Supreme Court was denied May 26, 1976.

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.