[No. A050009. First Dist., Div. Three. Feb. 27, 1992.]

SAN FRANCISCO FIRE FIGHTERS LOCAL 798, INTERNATIONAL ASSOCIATION OF FIRE FIGHTERS, AFL-CIO et al., Plaintiffs and Respondents, v.
BOARD OF SUPERVISORS OF THE CITY AND COUNTY OF SAN FRANCISCO et al., Defendants and Appellants.

1486

COUNSEL

Louise H. Renne, City Attorney, George A. Riley, Christina Hall, Bruce T. Carolan and Arthur Greenberg, Deputy City Attorneys, for Defendants and Appellants.

Davis, Reno & Courtney and Duane W. Reno for Plaintiffs and Respondents.

OPINION

WHITE, P. J.—This appeal arises from a writ of mandamus (Code Civ. Proc., § 1085) issued against the San Francisco Board of Supervisors and several city departments and department heads (hereafter referred to collectively as the City). The writ directs the City (1) to appoint respondent Thomas M. Stewart to the rank of captain in the San Francisco Fire Department, retroactive to November 13, 1989, and (2) to make no change in

the City's long-standing policy of filling all vacancies which occur in the promotional ranks of the fire department from the civil service lists which are in effect at the time the vacancies occur, unless and until respondent San Francisco Fire Fighters Local 798 (Local 798) has been provided with notice and an opportunity to meet and confer over such changes. We reverse.

I

FACTS

The dispute in this case was triggered by a seemingly innocuous San Francisco ordinance which provides that members of the fire department are entitled to a lump sum payment for unused sick leave upon retirement. The same ordinance mandates that the retiree's position remain vacant for a period sufficient to permit the City to recoup the amount which was paid to the retiree for accumulated sick leave. In other words, the position must remain vacant until the amount of salary which would have been paid to the retiree had he remained on the job equals the amount of lump sum sick leave paid at his or her retirement.

In order to accommodate individual departmental needs, however, the ordinance also grants the "appointing officer"—in this case, the chief of the fire department—the authority to request permission to immediately fill any vacancy created by retirement. The chief must submit the request for the "recommendation of the General Manager, Personnel, Mayor and approval . . . of the Board of Supervisors."

In the past, the fire department routinely submitted "immediate replacement" requests whenever civil service eligibility lists were about to expire. This permitted those who were on the eligibility lists to immediately fill vacancies which occurred during the time the lists were in effect. The net effect of this practice was that the fire department filled as many promotional vacancies as possible from an eligibility list before it expired.

The present controversy concerns the 1985 civil service eligibility list for the rank of H-30, captain, which expired on November 14, 1989. Respondent Stewart was a candidate on that list and was number 10 in line for the next promotion. In the past, immediate replacement requests had been submitted without public discussion or apparent controversy. However, as the expiration date for the 1985 list drew near, there was heated debate over whether the chief of the fire department should invoke his discretionary authority to request immediate replacement authorization in order to appoint nine new captains from the 1985 list before it expired on November 14, 1989.

Because of this controversy, various factions in the fire department expressed their views on the issue at the fire commission's August 29, 1989, meeting. The chief of the department, the president of respondent Local 798, and an attorney representing eight eligibles on the 1985 H-30 captain list all spoke in favor of continuing the practice of requesting immediate replacement. The sole opposition came from Robert Demmons, president of the Black Fire Fighters Association. Demmons said his association opposed immediate replacement because it would be inconsistent with a federal court consent decree which established a procedure for integrating the upper ranks of the San Francisco Fire Department. (*U.S.* v. *City and County of San Francisco* (N.D.Cal. 1988) 696 F.Supp. 1287.) The decree mandated a series of court-supervised promotional examinations. (*Id.*, at pp. 1314-1315.) The first H-30 examination to be administered under the decree was scheduled for November 18, 1989. Approximately 28 percent of the 193 persons eligible to compete on that exam were "protected class" members. By contrast, of the top nine candidates remaining on the 1985 H-30 list, eight were White males and one Hispanic. Thus, Demmons argued any vacancies should remain open to benefit the "protected class" members who planned to take the new H-30 captain examination.

At the conclusion of the hearing, the fire commission granted the chief authority to request immediate replacement for the nine captain vacancies which existed as of the date of the meeting (Aug. 29, 1989). However, the fire commission prohibited the chief from seeking immediate replacements for any retirements announced after that date. The commission members imposed this limitation because they were concerned senior department members might retire at the last minute to benefit candidates on the 1985 list who would not otherwise be promoted. In the past, some employees eligible for promotion had lobbied or paid off senior employees to encourage them to retire before an eligibility list expired.

After the fire commission issued its decision, certain plaintiffs and interveners challenged that decision in federal court on the ground it was inconsistent with the federal consent decree. The matter was heard before Judge Marilyn Hall Patel on October 4, 1989. Judge Patel noted that the consent decree did not address the practice of requesting immediate replacements, although it had long been the practice in the fire department. She also noted the fire commission had given the matter very thoughtful consideration and stated she would not "favorably entertain any challenge" to the fire commission's decision.

After receiving the green light from Judge Patel, the chief of the fire department submitted requests for the immediate replacement of the nine

positions that existed as of August 29, 1989. The mayor approved the request, and the board of supervisors passed a resolution authorizing the nine replacements.

*Stewart's Claim.*

On October 7, 1989—after the commission's August 29 meeting—a battalion chief retired, creating an additional vacancy in the H-30 ranks. Because he was next in line for promotion to that rank, respondent Stewart appeared at the fire commission's October 10, 1989, meeting to ask the commission to reconsider its decision limiting immediate replacement requests to those vacancies which existed as of August 29. The commission denied his request. Consequently, the chief did not request immediate replacement for the new vacancy, and the 1985 H-30 list expired before Stewart could be appointed to fill the position.

*Local 798's Request to Meet and Confer.*

Respondent Local 798 also objected to the commission's decision on the ground it violated the meet and confer obligations imposed by the Meyers-Milias-Brown Act (MMBA). (Gov. Code, §§ 3500-3510.)[1] After the commission handed down its decision, Local 798 wrote to the mayor and fire department to request that they meet and confer before changing the "long-standing practice" of requesting immediate replacement for all vacancies whenever an eligibility list is about to expire. The fire department responded that it had not, in fact, varied that long-standing practice because it had submitted immediate replacement requests for the nine positions open as of August 29. Consequently, the fire department did not believe the matter was subject to the meet and confer requirement.

In January of 1990 respondents Stewart and Local 798 filed a petition for a writ of mandate in the San Francisco Superior Court. The petition alleged the City had failed to meet and confer with Local 798 before the City changed its policy of requesting immediate replacement for *all* vacancies which occurred near the end of the life of a particular eligibility list. The petition also alleged the limitation imposed by the fire commission violated respondent Stewart's right to equal protection of the law.

Judge Ira A. Brown, Jr., granted a peremptory writ. The writ ordered the City (1) to appoint respondent Stewart to the rank of captain in the San Francisco Fire Department, retroactive to November 13, 1989; and (2) to

---

[1]Unless otherwise indicated, all further statutory references are to the Government Code.

make no change in the long-standing policy of requesting immediate replacement when civil service lists for fire department positions are about to expire, unless and until Local 798 has been provided with notice and an opportunity to meet and confer over such changes.

The City has appealed from the judgment granting the writ.

II

DISCUSSION

A. *Meet and Confer.*

The City first contends the decision to limit the requests for immediate replacement to those H-30 vacancies which existed as of August 29, 1989, was not subject to the MMBA's meet and confer requirement. We agree.

■  The MMBA applies to all local government employees in California. It has two stated purposes: (1) to promote full communication between public employers and employees, and (2) to improve personnel management and employer-employee relations. To effect these goals it requires that public agencies "meet and confer" with employee organizations before the agencies change ordinances, rules or regulations affecting matters "within the scope of representation . . . ." (§§ 3504.5 & 3505; *Building Material & Construction Teamsters' Union* v. *Farrell* (1986) 41 Cal.3d 651, 657 [224 Cal.Rptr. 688, 715 P.2d 648] (hereafter *Farrell*).) Changes in existing and acknowledged practices are subject to the meet and confer requirement even if those practices are not formalized in a written agreement or rule. (*International Assn. of Fire Fighters Union* v. *City of Pleasanton* (1976) 56 Cal.App.3d 959, 972-973 [129 Cal.Rptr. 68]; *Solano County Employees' Assn.* v. *County of Solano* (1982) 136 Cal.App.3d 256, 265 [186 Cal.Rptr. 147]; *Vernon Fire Fighters* v. *City of Vernon* (1980) 107 Cal.App.3d 802, 817 [165 Cal.Rptr. 908].)

"Meet and confer in good faith" means to exchange information, opinions and proposals, and to endeavor to reach an agreement. (§ 3505.) The phrase "scope of representation" is defined as including "all matters relating to employment conditions and employer-employee relations, including, but not limited to, *wages, hours, and other terms and conditions of employment,* except, however, that the scope of representation shall not include consideration of the *merits, necessity, or organization of any service or activity* provided by law or executive order." (§ 3504, italics supplied.)

The City contends its decision to limit the request for immediate replacements is not subject to meet and confer because that decision involved

consideration of the "merits, necessity, or organization" of a service or activity, and is therefore outside the scope of representation. Respondents, on the other hand, contend the decision clearly relates to "wages, hours, and other terms and conditions of employment" and consequently is subject to meet and confer.

■   The phrase "wages, hours, and other terms and conditions of employment" was taken directly from the National Labor Relations Act (NLRA); consequently, we may refer to federal as well as state precedent in interpreting this language. (*Fire Fighters Union* v. *City of Vallejo* (1974) 12 Cal.3d 608, 615-616 [116 Cal.Rptr. 507, 526 P.2d 971].) The limiting phrase (relating to the "merits, necessity or organization" of an activity) was added by the Legislature "not to restrict bargaining on matters directly affecting employees' legitimate interests in wages, hours and working conditions but rather to forestall any expansion of the language of 'wages, hours and working conditions' to include more general managerial policy decisions." (*Id.*, at p. 616.) Although the limiting phrase was not taken directly from the NLRA, it incorporates the limitations on the scope of mandatory bargaining developed by the federal courts in interpreting the NLRA. Thus, federal authorities furnish reliable precedent in construing this phrase as well. (*Ibid.*; *Farrell, supra,* 41 Cal.3d at p. 658.)

■   The fire commission's decision changed the accepted practice under which employees expected to be promoted. Consequently, there is no question the decision affected the "terms and conditions of employment." (*Fire Fighters Union* v. *City of Vallejo, supra,* 12 Cal.3d at p. 618 [proposal concerning firefighters' opportunities for advancement relates to the terms and conditions of their employment]; *International Assn. of Fire Fighters Union* v. *City of Pleasanton, supra,* 56 Cal.App.3d at pp. 968-971 [changes in notice procedures for promotional examinations involves condition of employment].) The City essentially concedes this point.

However, "[e]ven when the action of an employer has a significant and adverse effect on the wages, hours or working conditions of the . . . employees, the employer may yet be excepted from the duty to bargain under the 'merits, necessity, or organization' language of section 3504." (*Farrell, supra,* 41 Cal.3d at p. 660.) This occurs when the employer's action is a "fundamental managerial or policy decision" which falls outside the scope of representation. (*Ibid.*)

"Federal and California decisions both recognize the right of employers to make unconstrained decisions when fundamental management or policy

choices are involved. In his concurrence in [*Fibreboard Corp.* v. *Labor Board* (1964) 379 U.S. 203], Justice Stewart declared that management decisions that 'lie at the core of entrepreneurial control' or are 'fundamental to the basic direction of a corporate enterprise' should be excluded from the mandatory bargaining requirements of the NLRA. [Citation.] Thus federal cases have held an employer need not bargain about a decision to shut down a plant for economic reasons [citation], nor about a decision to cancel a contract with a customer, even though layoffs result from such cancellation [citation]." (*Farrell, supra,* 41 Cal.3d at p. 663.)

The California courts have applied a similar, though limited,[2] exception to the MMBA. In *San Jose Peace Officer's Assn.* v. *City of San Jose* (1978) 78 Cal.App.3d 935 [144 Cal.Rptr. 638], the court held that changes to a policy regarding the use of force by police officers were not within the MMBA's scope of representation. The court reasoned that managerial decisions are subject to meet and confer only if they "primarily" involve working conditions. (*Id.,* at pp. 945-946.) The court acknowledged the new use of force policy would affect the conditions of employment by affecting officer safety. However, the court concluded that "the safety of the policeman, as important as it is, is so inextricably interwoven with important policy considerations relating to basic concepts of the entire system of criminal justice that we cannot say that the use of force policy concerns 'primarily' a matter of wages, hours or working conditions." (*Id.,* at p. 946.) Thus, the court held that changes in the use of force policy were exempt from the meet and confer requirement. (*Id.,* at p. 947.)

Similarly, in *Berkeley Police Assn.* v. *City of Berkeley* (1977) 76 Cal.App.3d 931 [143 Cal.Rptr. 255], the city unilaterally allowed a member of the citizens' police review commission to attend closed police department hearings regarding citizen complaints against police officers. The officers' union challenged the decision on the ground the city had failed to meet and confer. (*Id.,* at pp. 934-936.) The Court of Appeal held the action was not within the scope of representation because it was a "fundamental policy decision[ ]." According to the court, "[t]o require public officials to meet and

---

[2]"California cases subsequent to *Fire Fighters Union,* as well as federal decisions, have consistently applied a standard which narrowly delimits the management prerogative and overriding public policy exception to collective bargaining. [Citation.] Within the scope of bargaining, for example, are a rule prohibiting county employees from driving motorcycles on county business [citation]; the practice of consulting with a police officers' association or an attorney prior to making oral and written reports about a shooting incident involving an officer [citation]; and a city resolution eliminating the rights of city employees to use city facilities to wash and maintain private vehicles [citation]." (*Sullivan* v. *State Bd. of Control* (1985) 176 Cal.App.3d 1059, 1065 [225 Cal.Rptr. 454].)

confer with their employees regarding fundamental policy decisions such as those here presented, would place an intolerable burden upon fair and efficient administration of state and local government." (*Id.,* at p. 937.)

■ Relying on *San Jose, Berkeley,* and other cases, the City first contends that the whole subject of immediate replacement is exempt from the meet and confer requirement because immediate replacement requests are fundamental management decisions involving fiscal and operational considerations. According to the City, it must be free to refrain from immediately filling vacancies in times of tight budgets or to immediately fill those vacancies when operational considerations so require. We believe this issue is a red herring. First, there is no suggestion the decision in this case resulted from economic or operational considerations. To the contrary, the fire commission decided to limit the requests for immediate replacement because it was concerned senior members might retire at the last minute to benefit candidates on the 1985 list who would not otherwise be promoted. Secondly, respondents are not challenging the City's overall authority to exercise discretion in requesting immediate replacements. Instead, respondents are challenging a change in a very specific practice. In the past, the City had routinely requested immediate replacement for all eligible fire department candidates when an eligibility list was about to expire, in order to benefit those candidates. But for a change in that policy, respondent Stewart would have been made a captain.

More important, a similar argument involving fiscal and operational considerations was rejected by the Supreme Court in *Farrell.* There, the San Francisco Civil Service Commission eliminated certain part-time truck driver positions and transferred the duties to full-time employees receiving lower pay. (41 Cal.3d at pp. 656-657.) The court stated: "Defendants claim their action was . . . a 'fundamental policy decision' because it involved the economical and efficient operation of local government. Again such cases as *Berkeley* and *San Jose* are distinguishable. Decisions involving the betterment of police-community relations and the avoidance of unnecessary deadly force are of obvious importance, and directly affect the quality and nature of public services. The burden of requiring an employer to confer about such fundamental decisions clearly outweighs the benefits to employer-employee relations that bargaining would provide. [¶] By contrast, defendants' decision to reorganize certain work duties was hardly 'fundamental.' It had little, if any, effect on public services. Rather, it primarily impacted the wages, hours, and working conditions of the employees in question and thus was a proper subject for mandatory collective bargaining. Indeed, defendants' claim to the contrary is in conflict with the statutory framework

of the MMBA: any issue involving wages, for example, would affect the cost of government services, but such matters are specifically included in the scope of representation as defined in section 3504." (*Id.*, at p. 664.)

Similarly, the City's decision to limit the requests for immediate replacement was hardly fundamental in this sense. It had little, if any, effect on public services. Rather, it primarily impacted the wages and promotional opportunities of the employee in question (respondent Stewart).

■ The City's next argument is more compelling. It argues that the decision to limit the requests for immediate replacement was a fundamental policy decision because the fire commission made that decision in an effort to further the goals of the federal consent decree. We agree.

There is no question the fire commission was attempting to address the requirements of the consent decree when it decided to limit the requests for immediate replacement. Consequently, the decision related to the "fundamental policy" of how best to carry out the terms of the consent decree and how to most expeditiously integrate the upper ranks of the fire department. However, that conclusion does not resolve the issue before us: namely, whether the specific decision at issue was subject to meet and confer. As the City itself acknowledges, the resolution of that issue requires a "delicate balancing of the different interests" involved. (*San Jose Peace Officer's Assn. v. City of San Jose, supra*, 78 Cal.App.3d at pp. 948-949.) Our Supreme Court has set forth the balancing test which must be applied in this case: "If an action is taken pursuant to a fundamental managerial or policy decision, it is within the scope of representation . . . if the employer's need for unencumbered decisionmaking in managing its operations is outweighed by the benefit to employer-employee relations of bargaining about the action in question." (*Farrell, supra*, 41 Cal.3d at p. 660, citation omitted.)

Obviously, this is a fluid standard. ■ However, in this particular case we believe "the employer's need for unencumbered decisionmaking" outweighs "the benefit to employer-employee relations of bargaining about the action in question." In order to undertake this analysis we need to precisely identify the action taken. Here, the fire commission did not wholly abandon its past practice of requesting immediate replacement when an eligibility list is about to expire. Instead, the commission continued that practice but limited it to positions open as of the date of its meeting. The commission imposed this limitation to address a very specific concern: namely, a well-grounded fear that droves of senior captains would retire at the last minute to benefit the nonminority candidates on the 1985 H-30 list.

The action had a very narrow impact on promotional opportunities and wages. Only one employee was denied promotion because of the limitation. On the other hand, the action served the important goal of protecting the integrity of the integration process established in the fire department. The fire commission needed to act swiftly to forestall attempts by senior captains to benefit those on the 1985 eligibility list at the expense of the minority candidates on the later list. Had the City taken the time to "meet and confer" on this issue, it is possible that its efforts to protect minority candidates would have been undermined by a rash of last minute retirements. Thus, the City had a strong need for "unencumbered decisionmaking" while the benefit from bargaining about the issue in question would have been narrow indeed.

In sum, given the narrow scope of the action taken by the commission, the need to act swiftly and decisively to forestall last minute "sham" retirements, and the fundamental importance of the interests the commission was trying to protect, we believe "the employer's need for unencumbered decisionmaking" outweighed the "benefit to employer-employee relations of bargaining about the action in question." Consequently, the decision to limit the requests for immediate replacement to nine was not subject to meet and confer.

B.  *Equal Protection.*

Respondents contend that, even if the decision to limit the request for immediate replacement was not subject to meet and confer, the decision nevertheless violated Stewart's right to equal protection of the law, and the judgment must be affirmed on that ground. Respondents did advance an equal protection argument below. However, the trial court's order and judgment granting the writ of mandate did *not* specify the court was finding in favor of respondents on the equal protection issue. Nevertheless, even if we assume the court did find a violation of equal protection, that determination could not stand on appeal.

In making their equal protection attack, respondents cite cases which articulate the traditional equal protection analysis when a suspect class or fundamental right is implicated. (See, e.g., Gay Law Students Assn. v. Pacific Tel. & Tel. Co. (1979) 24 Cal.3d 458 [156 Cal.Rptr. 14, 595 P.2d 592]; Cooperrider v. Civil Service Com. (1979) 97 Cal.App.3d 495, 504 [158 Cal.Rptr. 801].) However, those cases are not precisely applicable here. Instead, as respondents themselves concede, the fire commission did not limit the number of requests for immediate replacement in order to punish White candidates on the 1985 list, but did so in order to protect the integrity

of the federal consent decree, which was designed to remedy a past practice of unlawful racial discrimination in the fire department. (*U.S.* v. *City and County of San Francisco, supra,* 696 F.Supp at p. 1307; *Davis* v. *City and County of San Francisco* (9th Cir. 1989) 890 F.2d 1438, 1446.)

"It is well-settled that governmental bodies may constitutionally employ racial classifications essential to remedy a past practice of unlawful treatment of racial or ethnic groups subject to discrimination. [Citation.]" (*Davis* v. *City and County of San Francisco, supra,* 890 F.2d at p. 1445.) However, "[r]ace-based remedies to alleviate past discrimination are subject to some level of elevated scrutiny to pass muster under the equal protection clause." (*Ibid.*) Specifically, the means chosen to alleviate the past discrimination must be narrowly tailored to achieve a compelling governmental interest. (*Id.,* at pp. 1445-1446; *Richmond* v. *J. A. Croson Co.* (1989) 488 U.S. 469, 494, 507 [102 L.Ed.2d 854, 882, 890-891, 109 S.Ct. 706]; *United States* v. *Paradise* (1987) 480 U.S. 149, 166-167 [94 L.Ed.2d 203, 220-221, 107 S.Ct. 1053]; *Wygant* v. *Jackson Board of Education* (1986) 476 U.S. 267, 286 [90 L.Ed.2d 260, 276-277, 106 S.Ct. 1842].)

■ The government unquestionably has a compelling interest in remedying past and present discrimination by a state actor. (*United States* v. *Paradise, supra,* 480 U.S. at p. 167 [94 L.Ed.2d at p. 221].) Thus, even assuming Stewart was effectively denied promotion because of his race, that action does not violate equal protection if it was narrowly tailored to remedy a past history of discrimination in the fire department.

The president of the fire commission, James D. Jefferson, stated in a declaration that "in the past, individuals whose names appeared on a Civil Service eligibility list which was set to expire had attempted to create 'artificial' vacancies in the rank for that eligibility list by strongly lobbying, and in some instance paying members of the department in the affected rank . . . to take . . . retirement. . . . [¶] In order to avoid the creation of [such] artificial vacancies . . . the Commission decided to request immediate replacement of those vacancies which had been announced as of the time that the Commission reached its decision on August 19, 1989. To do otherwise . . . would have opened up the possibility of a rash of retirements occurring subsequent to the Commission's decision and would have effectively precluded appointments to the rank of Captain from the soon to be created eligibility list resulting from the promotional examination scheduled for November, 1989. This would have seriously undercut the efforts of the department to integrate the upper ranks of the department and might seriously jeopardize the City's ability to comply with the dictates of the Federal consent decree . . . ."

There is no question that the interest in remedying a documented history of racial discrimination in the San Francisco Fire Department is a "compelling governmental purpose" within the meaning of the case law. That issue has been litigated in the trial court (*U.S.* v. *City and County of San Francisco, supra,* 696 F.Supp. at pp. 1301-1302, 1307, 1311) and affirmed on appeal (*Davis* v. *City and County of San Francisco, supra,* 890 F.2d at pp. 1446-1447). Moreover, President Jefferson's personal conviction based on information relayed to him established the legitimacy of the commission's motivation. A state interest in remedying the effects of past discrimination "need not be accompanied by contemporaneous findings of actual discrimination to be accepted as legitimate as long as the public actor has a firm basis for believing that remedial action is required." (*Wygant* v. *Jackson Board of Education, supra,* 476 U.S. at p. 286 [90 L.Ed.2d at p. 276] (conc. opn. of O'Connor, J.); *Davis* v. *City and County of San Francisco, supra,* 890 F.2d at p. 1446.) The evidence here meets that standard.

The more difficult question is whether the decision to limit the requests for immediate replacements was "narrowly tailored" to achieve the governmental purpose. We think that it was.[3]

The Supreme Court has identified several factors which are useful in deciding if an action is "narrowly tailored" to its remedial purpose. Three factors are especially relevant here: (1) the necessity of the action and availability of alternative remedies; (2) the duration of the action; and (3) the impact of the action on third parties. (*United States* v. *Paradise, supra,* 480 U.S. at p. 171 [94 L.Ed.2d at p. 223]; *Davis* v. *City and County of San Francisco, supra,* 890 F.2d at p. 1447.)

It might be argued that other alternatives were available to ensure that subsequent retirements were "bona fide." For example, all officers retiring after the date of the meeting could have been required to undergo some form of examination to ensure that their retirement was not motivated by improper considerations. However, such a procedure would have been cumbersome, and, dealing as it necessarily would with subjective motivations, imprecise. The method selected by the commission was crude but effective. In our view, it was the only realistic alternative to ensure that subsequent retirements were bona fide.

---

[3]The consent decree itself was found to be "narrowly tailored" to meet its objectives, except for the duration of the decree. On appeal, the consent decree was modified to terminate after "seven years or sooner upon the accomplishment of the objectives or the goals of the consent decree." (*Davis* v. *City and County of San Francisco, supra,* 890 F.2d at pp. 1447-1448.)

Second, the duration of the action was extremely limited. The action was taken on August 29 and lasted only until the 1985 eligibility list expired on November 14.

Finally, and perhaps most important, the impact on third parties was also extremely limited. Only one person—respondent Stewart—was denied promotion because of the limitation. There was nothing to prevent Stewart from taking the new captain examination and waiting to be promoted from that list. Thus, the action delayed but did not clearly preclude Stewart from being promoted. (See *United States* v. *Paradise, supra,* 480 U.S. at p. 183 [94 L.Ed.2d at p. 231] [" 'Denial of a future employment opportunity is not as intrusive as loss of an existing job,' (citation) and plainly postponement imposes a lesser burden still."].)

In sum, we conclude that the decision to limit the requests for immediate replacement to those positions open as of the date of the commission's meeting was narrowly tailored to achieve a compelling governmental interest.

C.  *Disposition.*

The order and judgment granting peremptory writ of mandate is reversed.

Merrill, J., and Chin, J., concurred.

A petition for a rehearing was denied March 30, 1992, and respondents' petition for review by the Supreme Court was denied June 18, 1992. Kennard, J., was of the opinion that the petition should be granted.