[Civ. No. 53600. Second Dist., Div. Five. June 30, 1980.]

VERNON FIRE FIGHTERS, LOCAL 2312, INTERNATIONAL ASSOCIATION OF FIRE FIGHTERS et al., Plaintiffs and Appellants, v.
CITY OF VERNON, Defendant and Appellant.

804

## COUNSEL

Richard J. Silber and Molly Wilson for Plaintiffs and Appellants.

David B. Brearley, City Attorney, Whitmore & Kay and Richard S. Whitmore for Defendant and Appellant.

## OPINION

**STEPHENS, J.**—The City of Vernon (City) appeals from a judgment granting a peremptory writ of mandate in favor of Vernon Fire Fighters, Local 2312, affiliate of the International Association of Fire Fighters (Union) and Donald Podlas (Podlas), a fire captain with the City of Vernon Fire Department (Fire Department). The peremptory writ ordered that the City rescind disciplinary action taken against Podlas and reinstate him to his employment with restoration of all rights and benefits, and expunge the disciplinary action from his employment record. More broadly, the writ also required that the City set aside and rescind action taken by it on August 9 and 17, 1976,[1] at least to the extent that the action prohibits firemen from using city facilities to wash personal automobiles while not on duty. In addition, the City was ordered to reinstate the right of all firemen on 24 hour shifts to wash their private automobiles on City premises during off-duty time. The remainder of the orders dealt with requiring the City to engage in

---

[1] On August 9, 1976, the city council met and passed a motion which required that "the Finance Committee make the following recommendations to the City Council: (1) That there be an order issued prohibiting any City employee from using City facilities to wash his or her personal automobile, boat, trailer, camper or other personal equipment, and if the order is violated, that the employee be subject to disciplinary action; and (2) That an order be issued prohibiting any City employee from using any tools, equipment and/or City facilities for his or her personal benefit, and if the order is violated, that the employee be subject to disciplinary action." At the August 17 meeting, the city council received such a recommendation from the finance committee and passed a motion approving the recommendation.

collective bargaining in the future regarding similar actions to be taken by the City and a requirement that the City provide various procedural steps prior to any discipline of the members of Local 2312. The City appeals from each of the above provisions; respondent Union cross-appeals from the trial court's finding that the resolutions passed by the City were not void in their entirety due to alleged violation by the City of the Meyers-Milias-Brown Act (MMBA.) (Gov. Code, § 3500 et seq.)

The instant dispute is centered around the above quoted resolution adopted by the Vernon City Council.

The genesis of this resolution, which originated as a recommendation by the finance committee of the city council, was a worker's compensation claim filed by a city employee who had injured himself while washing his car on city premises. Subsequent to its passage, the Union raised objections to the rule, and the City modified the rule in regard to firemen on 24-hour duty so that when such firemen were leaving duty, they could rinse the early morning dew off their car windows before driving home.[2]

On February 4, 1977, Podlas violated the rule by washing his car on city property with city equipment.[3] Notice of the violation was sent to Podlas on February 16, 1977, also advising him of his maximum discipline, demotion, and of his opportunity to appear at a hearing before the disciplinary action would become effective. Such a hearing was held on March 1, 1977. However, neither Podlas nor the Union produced any evidence or called any witnesses. The only response to the charge was a reading of a statement of the position of the Union and Podlas by

---

[2]On October 19, 1976, the city council unilaterally modified the previous order to allow fire fighters to wash their cars under certain conditions. The policy is set forth in a memorandum from Fire Chief Colvin as follows: "At the Vernon City Council Meeting this date, Councilman Kaeser asked the Council (present were Mayor Malburg, Councilman Ybarra and Councilman Gonzales) if Firemen could be permitted to wash off their cars with a garden hose because of the heavy dew on the windows in the mornings. The Council agreed to his suggestion.

"Cars may be washed off with a garden hose in the early A.M. only, and upon departure from work."

[3]Fire fighters of the City of Vernon had been allowed to wash and maintain their private automobiles while on duty since 1923. As a precondition to Fire Department employment, they are required to have an automobile in good working order, so that they can respond to emergency calls during their off-duty time. The trial court found that "Fire Fighters have this privilege, since they work twenty-four hour shifts unlike other City Employees."

their attorney. Their position was that the City had failed to grant Podlas procedural due process, that the City had violated the requirements of MMBA and the employer-employee resolution 4027 previously enacted by the City, by failing to "meet and confer" over the rule. They also maintained that Podlas' acts did not violate the October 10 modification of the rule against car washing, as he merely "washed his car off with a garden hose about 7:30-8:00 A.M. [after duty hours] and wiped off the water and soap with a rag." The matter was taken under submission by the council.

At the March 15, 1977, meeting the city council decided that Podlas would be suspended for three shifts and receive no overtime for a six-month period, effective April 1, 1977. Thereafter, on April 12, 1977, a petition for writ of mandate was filed on behalf of Union and Podlas. The matter was argued on May 10 before Judge Charles H. Phillips of the superior court.

At the outset, a dispute arose as to whether the petition was properly one under Code of Civil Procedure section 1085 or section 1094.5; the first section being traditional mandamus, the latter covering administrative mandamus.

A traditional writ of mandate under section 1085 is a method of compelling the performance of a legal, usually ministerial duty, whereas the purpose of an administrative mandamus proceeding, under section 1094.5, is to review the final adjudicative action of an administrative body. (Cal. Civil Writs (Cont.Ed.Bar 1978) § 5.8, p. 67.) A further distinction between the two procedures is that under section 1094.5, the only evidence allowed to be presented (absent special circumstances not here applicable) is the administrative hearing transcript.[4] As stated in California Administrative Mandamus (Cont.Ed.Bar. 1966) Evidence, section 13.5, page 218: "A peculiarity of administrative mandamus proceedings that many attorneys find difficult to comprehend is that...the only item of evidence that is usually received [at the trial] is the administrative record" and that it is usually not appropriate to offer other evidence, such as affidavits. In this case, despite the fact that the petition purported to seek a writ of mandamus under section 1085, the court determined that the action fell under section 1094.5 and yet al-

---

[4]The exceptions to this rule are: (1) evidence that, in the exercise of reasonable diligence could not have been presented at the administrative hearing, or (2) evidence improperly excluded at the administrative hearing. (Code Civ. Proc., § 1094.5, subd. (e).)

lowed admission of declarations into evidence that were not part of the administrative hearing record. Appellant City claims that the trial court exceeded the proper scope of review in so doing.

Section 1094.5 of the Code of Civil Procedure reads in pertinent part as follows: "(a) Where the writ is issued for the purpose of inquiring into the validity of any final administrative order or decision made *as the result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken and discretion in the determination of facts is vested in the inferior tribunal, corporation, board or officer*, the case shall be heard by the court sitting without a jury. All or part of the record of the proceedings before the inferior tribunal, corporation, board or officer may be filed with the petition, may be filed with respondent's points and authorities or may be ordered to be filed by the court.

"(b) The inquiry in such a case shall extend to the questions whether the respondent has proceeded without, or in excess of jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence.

"(c) Where it is claimed that the findings are not supported by the evidence, in cases in which the court is authorized by law to exercise its independent judgment on the evidence, abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence; and in all other cases, abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record." (Italics added.)

Section 1085, Code of Civil Procedure, reads as follows: "[A writ] may be issued to any court, except municipal or justice court, to any inferior tribunal corporation, board, or person, to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station; or to compel the admission of a party to the use and enjoyment of a right or office to which he is entitled, and from which he is unlawfully precluded by such inferior tribunal, corporation, board or person."

Appellant contends that the trial court was correct in arriving at the conclusion that the writ of mandate fell under the provisions of section

1094.5, rather than section 1085 as indicated on the face of the writ, but that the trial judge erred in allowing respondents to enter two declarations by Podlas and two by the president of the Union into evidence. As appellant points out, the findings of fact and conclusions of law written by respondent and adopted almost verbatim by the trial judge contain conclusions that could only be based upon the declarations that were offered into evidence.

Therefore, we must first determine whether the proceeding below is one to be held properly under section 1085 or section 1094.5. We address the issue first as to the Union, and find that since it had properly proceeded under section 1085, there is no need, for reasons which will become apparent, to address the issue as to Podlas.[5]

## I.

The Union, in seeking to void the anticar-wash rule in its entirety, properly proceeded under section 1085 of the Code of Civil Procedure.

Section 1085 covers traditional mandamus proceedings. The relief sought by the Union falls within this category, as the Union was not seeking review of the administrative hearing before the city council per se, but broader relief aimed at the avoidance of the anticar-washing rule in its entirety. The basis for the request to have the rule set aside was an alleged abuse of discretion on the part of the City in enacting the rule contrary to the provisions of the MMBA. "While mandamus will not lie to control the discretion exercised by a public officer or board . . . it will lie to correct an abuse of discretion by such officer or board." (*Glendale City Employees' Assn., Inc.* v. *City of Glendale* (1975) 15 Cal.3d 328, 344, fn. 24 [124 Cal.Rptr. 513, 540 P.2d 609], quoting *Baldwin-Lima-Hamilton Corp.* v. *Superior Court* (1962) 208 Cal.App.2d 803, 823 [25 Cal.Rptr. 798].) The Union properly sought relief by writ of mandate under section 1085, and the trial judge was therefore correct in admitting the declarations into evidence. In order to be entitled to the relief sought, the Union had to have established that the anticar-washing rule was enacted in violation of the MMBA.

[5]We also note that the entire question of disciplining Podlas is moot. Captain Podlas has been off work since December 1977 and was removed from the City payroll on August 16, 1978. Subsequently, the City determined that he was eligible for a disability retirement effective April 30, 1979. Therefore, the discipline in question can never be imposed upon him.

The findings of facts and conclusions of law demonstrate that the trial judge found that the Union had succeeded in this task. We agree.

## II.

> The rule, being unilaterally adopted by the city council without prior notice to or meeting and conferring with the Union, was void in its entirety for procedural violation of section 3505 of the Government Code (MMBA).

In its August 17, 1976, meeting, the city council passed the resolution in question, eliminating the rights of all City employees—including fire fighters—to wash and maintain private vehicles. At this meeting the council, adopting a recommendation by the finance committee, resolved to issue an order terminating this existing privilege, and provided that violation of the order would be a disciplinary offense. The trial court found that the decision to abolish these privileges was made "without any *prior* notice to or discussions with the Union." The trial court also found that fire fighters had "been allowed to wash their private cars during on-duty and off-duty time on City premises since the creation of the Fire Department in or about 1923." (Italics added. see fn. 3, *ante.*)

■ The MMBA, applicable to all local government employees, codifies California's recognition of the right of public employees to collectively bargain with their government employers, and reflects "the strong policy in California favoring peaceful resolution of employment disputes by means of arbitration." (*Fire Fighters Union* v. *City of Vallejo* (1974) 12 Cal.3d 608, 622 [116 Cal.Rptr. 507, 526 P.2d 971].)[6]

---

[6]In 1961 the Legislature enacted the Brown Act (Gov. Code, §§ 3500-3509, eff. Sept. 15, 1961), under which it recognized the right of public employees to join organizations of their own choice and to be represented by such organizations in their employment relationships with public agencies. In 1968 the act was amended and expanded, and became known as the Meyers-Milias-Brown Act (Gov. Code, §§ 3500-3510.)

Section 3500 provides in pertinent part as follows: "It is the purpose of this chapter to promote full communication between public employers and their employees by providing a reasonable method of resolving disputes regarding wages, hours, and other terms and conditions of employment between public employers and public employee organizations. It is also the purpose of this chapter to promote the improvement of personnel management and employer-employee relations within the various public agencies in the State of California by providing a uniform basis for recognizing the right of public employees to join organizations of their own choice and be represented by such organizations in their employment relationships with public agencies.... This chapter is intended...to strengthen merit, civil service and other methods of adminis-

■ The MMBA applies to all local government employees in California. Section 3504.5 requires that the city give "reasonable written notice" to organizations such as respondent Union, of any proposal for legislative action directly relating to matters within the scope of representation.[7] (*International Assn. of Fire Fighters Union* v. *City of Pleasanton* (1976) 56 Cal.App.3d 959, 966 [129 Cal.Rptr. 68].) Section 3505 further requires the city to "meet and confer in good faith" with representatives of the union, concerning "wages, hours, and other terms and conditions of employment" of the personnel represented by the union.[8]

The term "scope of representation" is defined in section 3504 of the Government Code as including "'all matters relating to employment conditions and employer-employee relations, including, but not limited to, wages, hours, and other terms and conditions of employment, *except, however, that the scope of representation shall not include consideration of the merits, necessity, or organization of any service or*

---

tering employer-employee relations through the establishment of uniform and orderly methods of communication between employees and the public agencies by which they are employed."

[7]Section 3504.5 reads in pertinent part: "Except in cases of emergency,...the governing body of a public agency,...shall give reasonable written notice to each recognized employee organization affected of any ordinance, rule, resolution, or regulation directly relating to matters within the scope of representation *proposed to be adopted*...and shall give such recognized employee organization the opportunity to meet with the governing body or such boards and commissions. [¶] In cases of emergency when the governing body...determine[s] that an ordinance, rule, resolution or regulation must be adopted immediately without *prior notice or meeting* with a recognized employee organization, the governing body...shall provide such notice and opportunity to meet at the earliest practicable time following the adoption of such ordinance, rule, resolution, or regulation." (Italics added.)

[8]Section 3505 provides in pertinent part: "The governing body of a public agency..., shall meet and confer in good faith regarding wages, hours, and other terms and conditions of employment with representatives of...recognized employee organizations,... and shall consider fully such presentations as are made by the employee organization on behalf of its members *prior to* arriving at a determination of policy or course of action. [¶] 'Meet and confer in good faith' means that a public agency, or such representatives as it may designate, and representatives of recognized employee organizations, shall have the mutual obligation *personally* to meet and confer promptly upon request by either party and continued for a reasonable period of time in order to exchange freely information, opinions, and proposals, and to endeavor to reach agreement on matters within the scope of representation prior to the adoption by the public agency of its final budget for the ensuing year. The process should include adequate time for the resolution of impasses where specific procedures for such resolution are contained in local rule, regulation, or ordinance, or when such procedures are utilized by mutual consent." (Italics added.)

*activity provided by law or executive order.*" (Italics in original.) *Berkeley Police Assn.* v. *City of Berkeley* (1977) 76 Cal.App.3d 931, 936 [143 Cal.Rptr. 255].) This latter, italicized language was added to the original statute in 1968 "not to restrict bargaining on matters directly affecting employees' legitimate interests in wages, hours and working conditions but rather to forestall any expansion of the language of 'wages, hours and working conditions' to include more general managerial policy decisions." (*Fire Fighters Union* v. *City of Vallejo* (1974) 12 Cal.3d 608, 616 [116 Cal.Rptr. 507, 526 P.2d 971].) The Supreme Court however, emphasized that "state policy in California 'favors arbitration provisions in collective bargaining agreements and recognizes the important part they play in helping to promote industrial stabilization.'"[9] (*Id.* at p. 622, quoting *Posner* v. *Grunwald-Marx, Inc.* (1961) 56 Cal.2d 169, 180 [14 Cal.Rptr. 297, 393 P.2d 313].) The *Vallejo* court concluded by stating the need for a cautious judicial approach, admonishing that "[w]e...must be careful not to restrict unduly the *scope* of the arbitration by an overbroad definition of 'merits, necessity or organization.'" (Italics in original. *Id.* at p. 615.)

### A.

The City contends that the anticar-washing rule is not a "term and condition of employment" within the Union's "scope of representation," but rather a "general managerial policy decision" within the meaning of section 3504's exception pertaining to "merits, necessity, or organization of any service or activity provided by law or executive order." Consequently, the City argues that enactment of the rule was not subject to the "meet and confer" requirements of the MMBA nor to that of resolution 4027, the "Employer-Employee Relations Resolution of the City of Vernon."[10]

---

[9]There is no longer any question that the scope of negotiations under section 3504 corresponds to that in the private sector, as seen in the similarity of the statutory provisions relating to each, and that "the bargaining requirements of the National Labor Relations Act [hereinafter NLRA] and cases interpreting them may properly be referred to for such enlightenment as they may render..." (*Fire Fighters Union* v. *City of Vallejo, supra*, 12 Cal.3d 608, 617. See fn. 12, *infra*.)

[10]Pursuant to Government Code section 3507, on January 19, 1971, the city council adopted resolution 4027. The resolution requires the City to meet and confer in good faith with recognized employee organizations on "all matters relating to employment conditions and employer-employee relations, including, but not limited to wages, hours, and other terms and conditions of employment." (§ 6(A).) However, the introduction to section 5 states that "[i]n order to insure that the City is able to carry out its statutory functions and responsibilities, the City of Vernon has and will retain exclusive

Section 5 of resolution 4027 (City Responsibilities and Rights) grants the City exclusive discretion "[t]o establish reasonable work and safety rules and regulations" (subsec. P), and "[t]o exercise complete control and discretion over its organization and the technology of performing its work and services." (Resolution 4027, subsec. O.)

The City cannot, by resolution, simply exempt itself from having to meet and confer prior to its adoption of "work and safety rules and regulations," if in the specific factual context the rule or regulation in question falls primarily within the "scope of representation" of the Union. It is evident that the exclusionary clauses of resolution 4027, and the exception language found in section 3504, *supra*, (p. 819 of this opn.) substantially overlap with those clauses requiring a "meet and confer" situation, that is, matters relating to "employment conditions."

When a rule, such as the one in question, can apparently fit into either category, we must decide to which it primarily belongs—taking into consideration both precedent and the underlying policies of the MMBA. (See *Fire Fighters Union* v. *City of Vallejo, supra,* 12 Cal.3d 608.)

In discussing the dual purpose of the MMBA, to promote full communication between and to improve relations among employers and employees within the various public agencies, the Supreme Court, in *Los Angeles County Civil Service Com.* v. *Superior Court* (1978) 23 Cal.3d 55 [151 Cal.Rptr. 547, 588 P.2d 249], noted that section 3507 reserved to local agencies the right to pass ordinances and promulgate regulations consistent with the above purposes, and stated that to extend "a broader insulation from MMBA's requirements would allow local rules to undercut the minimum rights that the MMBA guarantees." (*Id.* at p. 63; see also *Huntington Beach Police Officer's Assn.* v. *City of Huntington Beach* (1967) 58 Cal.App.3d 492, 502 [129 Cal. Rptr. 893].) And in *Los Angeles County Firefighters Local 1014* v. *City of Monrovia* (1972) 24 Cal.App.3d 289, 295 [101 Cal.Rptr. 78], the court concluded that "if the [employer-employee relations] rules and regulations of a public agency do not meet the standard established by the Legislature, the deficiencies of those rules and regulations...are

---

rights to manage and direct the performance of City services and the work force performing such services..." and then continues by specifically excepting, *inter alia*, the enactment of "reasonable work and safety rules and regulations" from the meet and confer process. (Subsec. P.)

supplied by the appropriate provisions of the act." Thus, labeling the anticar-wash rule as one of "safety and regulation" does not in itself exempt it from the "meet and confer" requirement.

We find that in the factual context of this record the adoption of the anticar-wash rule was subject to the "meet and confer" requirement of the MMBA.

In the private sector it has been found that disciplinary and plant rules are examples of "terms and conditions of employment," as that phrase is used in the Labor Management Relation Act. (See Morris, The Developing Labor Law (1971) at pp. 404-405, and cases cited therein.)[11]

California courts "have often looked to federal law for guidance in interpreting state provisions whose language parallels that of the federal statutes." (*Social Workers' Union, Local 535* v. *Alameda County Welfare Dept.* (1974) 11 Cal.3d 382, 391 [113 Cal.Rptr. 461, 521 P.2d 453]; *Fire Fighters Union* v. *City of Vallejo, supra,* 12 Cal.3d 608, 616); and it is now widely recognized that sections 3504 and 3505 of the MMBA borrowed language from section 158, subdivision (a)(5) and subdivision (d)[12] of the NLRA. (29 U.S.C. § 141 et seq.)

---

[11]Referring to the NLRA, Morris states that: "Numerous topics fall within 'other terms and conditions of employment' as this phrase is used in the Act. Many are now so clearly recognized to be mandatory subjects for bargaining that no discussion is required. Among these topics are the following: Provisions for a grievance procedure and arbitration, layoffs, discharge, work loads, vacations, holidays, sick leave, *work rules,....*" (citing *NLRB* v. *Southern Transp., Inc.* (8th Cir. 1965) 343 F.2d 558; *Tower Hosiery Mills, Inc.* (1949) 81 NLRB 658; *Timken Roller Bearing Company* (1946) 70 NLRB 500, *enforcement denied on other grounds* 161 F.2d 949 (6th Cir. 1947).) (Morris, *supra,* at pp. 404-405. Italics added.)

[12]National Labor Relation Act, section 8(a)(5), 49 Statutes 452-453, as amended 29 United States Code section 158 (a)(5) reads: "It shall be an unfair labor practice for an employer...to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title."

As the Supreme Court noted in *Fire Fighters Union* v. *City of Vallejo, supra,* 12 Cal.3d 608, 615, "the phrase 'wages, hours and other terms and conditions of employment' in the MMBA was taken directly from the [following section] of the National Labor Relations Act":

"For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment ...." (National Labor Relations Act, section 8(d), added by 61 Stat. 142, 29 U.S.C. § 158(d).)

Moreover, in *Tiidee Products, Inc.* (1969) 176 N.L.R.B. 969, enforcement granted 440 F.2d 298 (D.C. Cir. 1970), the Board stated: "Nor is it necessary to determine which, if any, of the rules constitute mandatory subjects of bargaining. The fact that penalties were prescribed for breaches thereof sufficiently affected the conditions of employment to make them mandatory subjects of bargaining." (*Id.* at p. 976.) In *Murphy Diesel Company* (1970) 184 N.L.R.B. 757, enforcement granted 454 F.2d 303 (7th Cir. 1971), the Board found that the new requirements, all of which exposed the employees to a jeopardy which had not prevailed under the preexisting rules, "vitally affected employee tenure and conditions of employment generally" and were therefore matters which were not subject to unilateral employer control. (*Id.* at p. 763.)

In *Peerless Publication* (1977) 231 N.L.R.B. 244, no doubt was left that a penalty provision "in and of itself" can make an otherwise nonincluded rule a term and condition of employment. After finding that a newspaper's code of ethics for its employees, as a whole, "[did] not affect terms and conditions of employment so as to constitute a mandatory subject of bargaining," the board found that an included penalty provision *"in and of itself,* directly affect[ed] employment security, and, therefore [was] a mandatory subject of bargaining." (Italics added.) The Board therefore concluded that the "unilateral promulgation of its Code of Ethics, to the extent that [it] contained a penalty provision, was violative of Section 8(a)(5) and (1) of the [NLRA]." (*Id.* at p. 245.)[13]

Of equal relevance to the case at bench is the fact that the board in *Peerless Publications, Inc., supra,* found that the employer's failure to bargain over a rule with respect to *"use of equipment for private purposes"* also violated the above sections of the NLRA. (*Id.* Italics added.) We note that the penalty provision of the rule in question has potentially unlimited application in terms of the possible consequences to the employee for violation of the rule. It simply read that if the order is violated the "employee [is] subject to disciplinary action." (See fn. 1, *ante,* of this opn.)[14]

---

[13]The board stated that a finding that some rules were excepted from the parameters of the meet and confer requirement, as managerial prerogatives, did not relieve the employer "from its obligation to bargain over any penalty provision for employee violations of such rules." (*Id.*)

[14]There is no question that the penalty provision "exposed [Captain Podlas] to jeopardy," nor that it "affected employee tenure and conditions." The fact that the

Therefore, both with regard to its penalty provision and because it was a work rule, the applicable federal standard would clearly establish the rule in question as a "term or condition of employment."

We also agree with the trial court's conclusion that the "privilege of Fire Fighters to wash their cars...on City premises with City facilities was a practice that was sufficiently widespread and of sufficient duration to constitute an implied condition of employment." As previously stated, City fire fighters had been allowed to wash and maintain their private automobiles while on duty since 1923. The court, in *International Assn. of Fire Fighters Union* v. *City of Pleasanton, supra*, 56 Cal.App.3d 959, 972, held that "an existing and acknowledged *practice*" affecting conditions of employment has the same dignity as "an existing agreement or rule."

The City, however, while agreeing that the rule in question may touch upon a term and condition of employment, urges this court to apply the exception which occurs in cases where the change in, or initiation of, a rule has little or no impact on the employees or their working conditions (see *Pacific Diesel Parts Company* (1973) 203 N.L.R.B. 820), and thus is not subject to the "meet and confer" requirement. Citing *Social Services Union* v. *Board of Supervisors* (1978) 82 Cal.App.3d 498, 504 [147 Cal.Rptr. 126], the City contends that the rule in question is an "indirect and insubstantial fringe benefit"—since it did not "*materially* or *significantly* affect the terms or conditions of employment"—and is therefore not subject to the meet and confer requirement. (*Seattle First National Bank* v. *N. L. R. B.* (9th Cir. 1971) 444 F.2d 30, 32-33. Italics in original.)

The *Social Services Union* court found that "a charge for employee parking supplied by the agency [was not a material change in a term or condition of employment] where (1) agency-supplied parking [was] available only to 'a minority' of employees, [and] (2) employees [were] not required to utilize agency-supplied parking but [could] reasonably

disciplinary provision "directly affect[ed] employment security" is clearly demonstrated in the instant case in that the council resolved that Podlas be suspended for three shifts and deprived of overtime for a six-month period; moreover, Fire Chief Colvin further recommended that Podlas be reduced in rank from "Captain Grade One" to "Captain Grade Three." Therefore, the imposed discipline directly affected the captain's wages, and the recommended discipline went to the heart of any meaningful definition of "job security." Because both wages and demotions are clearly within the prohibitory scope of the MMBA's meet and confer requirements, a disciplinary rule directly affecting either is also clearly within that scope.

use methods other than automobile transportation or other available parking;..." (*Id.* at pp. 500-501.)

In arriving at its decision, the court weighed the following factors: "...the extent to which the service materially affects the employees' living conditions [citation]; the presence or absence of feasible alternatives to the employer-provided service available to the employees [citations]; the value of the employer-provided service [citation]; and the extent to which the employer-provided service has been presented by the employer as an alternative to cash compensation [citation]." (*Id.* at pp. 504-505.)

The requirement of an automobile in good working order for continued employment,[15] coupled with the unique nature of 24-hour shifts and the severity of available sanctions for infraction of the work rule, in the instant case disallow characterizing it as being only of an indirect and insubstantial benefit to the fire fighters. Applying the balancing factors set forth by the *Social Services Union* court, *supra*, the possible sanctions for infraction and/or loss of an automobile in good working order will heavily affect the employees' living conditions as possibly resulting in a loss of job, or—as with Podlas—loss of overtime for an extended period and the possibility of demotion;[16] alternatives to the service in question seem to be remote or nonexistent, given the nature of 24-hour shifts; the value of the services goes without question in light of the aforementioned factors; and, finally, there is no evidence in the record —it being unlikely however—that the matter in question was presented by the employer as an alternative to cash compensation.

Unlike "minor changes in benefits made available to a minority of employees at their option" (*Social Services Union, supra*, at p. 501), the rule in the instant case changed an acknowledged "agreement or rule" having been in existence 53 years.

The case at bar is also distinguishable from *San Jose Peace Officer's Assn.* v. *City of San Jose* (1978) 78 Cal.App.3d 935 [144 Cal.Rptr. 638], in which the court held that a policy adopted by the City of San

---

[15]We find in the requirement of an automobile in good working order—as a precondition to fire department employment—the implied condition that the same is a requirement of continued employment.

[16]Because the practice in question is thus materially significant to the status of the employees, the adoption of the rule terminating it is of equal significance.

Jose governing when a police officer may discharge his firearm was not subject to the meet and confer requirement. The court found that the policy was "primarily a matter of public safety," and that "[w]hile [it] may impinge on a condition of employment [the safety of the officer, it does so] only indirectly." (*Id.* at p. 947.)

The remoteness of the danger to the officer appears to have been more in the mind of the court than in the actualities of the street. The following language used by the court sheds more light on the true basis of its finding that the matter in question was a "managerial policy decision," falling within the section 3504 exception—"merits, necessity or organization"; "[t]he power of a city to enact and enforce regulations relating to the use of firearms by police officers is in the exercise of the police power granted by...the California Constitution [citation]. A governmental agency may not suspend, bargain or contract away its police power. [Citations.]" (*Id.* at p. 947.) This conclusion is consistent with the federal delineation of that exception in that nothing could be more fundamental than a decision of "when and under what circumstances San Jose will permit a human life to be taken." (*Id.* at p. 948.)[17] The court concluded that the forum of the bargaining table was not the place for the delicate balance of "'the protection of society from criminals, the protection of police officer's safety, and the preservation of all human life, if possible.'" (*San Jose Peace Officer's Assn., supra*, at p. 948 quoting *Long Beach Police Officers Assn.* v. *City of Long Beach* (1976) 61 Cal.App.3d 364, 371 [132 Cal.Rptr. 348].)

Also distinguishable from the case before us is the holding that certain policies enacted by the City of Berkeley with regard to administerial procedures within the police department,[18] "clearly constitute[d]

[17]The court noted that "the safety of the policeman, as important as it is, is so inextricably interwoven with important policy considerations relating to basic concepts of the entire system of criminal justice that we cannot say that the use of force policy concerns 'primarily' a matter of wages, hours or working conditions." (*San Jose Peace Officer's Assn.* v. *City of San Jose, supra,* 78 Cal.App.3d 935, 946.)

The United States Supreme Court has stated that managerial decisions as examples of the indirect impingement exception are those "...which lie at the core of the entrepreneurial control." (*San Jose Peace Officer's Assn. supra* at p. 944, quoting *Fibreboard Corp.* v. *Labor Board* (1964) 379 U.S. 203, 223 [13 L.Ed.2d 233, 245, 85 S.Ct. 398, 6 A.L.R.3d 1130] (conc. opn. by Stewart J.).)

[18]The policies in dispute were that of (1) allowing a member of the citizens' police review commission to sit in on police department board of review hearings on citizen complaints against police officers and (2) sending a representative of the police department to citizens' commission trial board meetings to answer questions of commission members concerning the department's position on individual complaints. (*Berkeley Police Assn., supra*, at p. 937.) This procedure was developed by the chief of police to

management level decisions," and therefore were "not properly within the scope of union representation. . . ." (*Berkeley Police Assn.* v. *City of Berkeley* (1977) 76 Cal.App.3d 931, 937 [143 Cal.Rptr. 255].)

An even more significant distinction is the finding of the court that the new policies were "in full compliance with existing department rules and regulations." It also found that the "[a]ppellants were working under these rules and conditions even prior to the challenged practices. Hence, [unlike the instant case] the terms and conditions of. . .employment have remained unchanged, notwithstanding Chief Pomeroy's announced new policies, and respondents had no obligation to meet and confer before implementing them."[19] (*Berkeley Police Assn., supra*, at p. 938.)

### B.

█ In spite of the foregoing, the City, nevertheless, contends that it was not required to meet and confer with the Union, but only to "meet and consult," as these terms are used in section 3507 of the MMBA. Appellant City argues that the trial court "misunderstood the basic legal obligation imposed on [it] by the [MMBA]," and claims that section 3507 "deals with adoption of rules by a local agency and does not impose a duty to meet and confer." Appellant then asserts that its duty under "consultation" is substantially less than that required under "meeting and conferring."

In pertinent part section 3507 (Rules and Regulations) states that: "A public agency may adopt reasonable rules and regulations after consultation in good faith with representatives of an employee organization or organizations for the administration of employer-employee relations under this chapter (commencing with Section 3500). [¶] Such rules and regulations may include provisions for. . .(e) additional procedures for the resolution of disputes involving wages, hours and other terms and conditions of employment. . .[and] (i) such other matters as are necessary to carry out the purposes of this chapter."

---

complement the citizens' police review commission which had been established by initiative ordinance. (*Id.* at pp. 934-935.)

[19]The court found that Chief Pomeroy's decision to disclose contents of the police reports to members of the police review commission was "in full compliance with" Berkeley Police Department regulation PR 253, which provided that "'[e]mployees shall not divulge to any person not connected with the department information acquired by his employment if the information might discredit or imperil the efficiency of the department, *unless required by law, departmental order, or order of a commanding officer.* Departmental records and reports shall be exhibited only in conformity with departmental orders.'" (*Berkeley Police Assn., supra*, at p. 938.) (Italics in original.)

It is obvious that this section is intended solely to govern the adoption of additional procedures for the resolution of the rules relating to local labor relations, and not to the adoption of the rules themselves. (See, Grodin, *Public Employee Bargaining in California: The Meyers-Milias-Brown Act in the Courts* (1972) 23 Hastings L.J. 719, 736-738.) This is also evident from the nature of the disputes involved in the appellate cases deciding section 3507 issues. (See, *Organization of Deputy Sheriffs* v. *County of San Mateo* (1975) 48 Cal.App.3d 331 [122 Cal.Rptr. 210]; *Sacramento County Employees Organization, Local 22 etc. Union* v. *County of Sacramento* (1972) 28 Cal.App.3d 424 [104 Cal.Rptr. 619].)

Moreover, even if section 3507 were found to be applicable to the promulgation of the rules themselves, after a lengthy analysis of the meaning of term "consultation in good faith," the court, in *International Assn. of Fire Fighters Union* v. *City of Pleasanton* (1976) 56 Cal.App.3d 959, 976 [129 Cal.Rptr. 68], concluded by "perceiv[ing] no basis for distinguishing between the term 'consultation in good faith,' as used in section 3507, and the 'meet and confer in good faith' process defined in section 3505." We agree with this interpretation.

### C.

Having found the anticar-wash rule to be a mandatory negotiable subject under the MMBA, we now turn to review the contention by both parties that the remedy afforded the Union by the trial court was in error. Specifically, was the trial court correct in declaring the order void—only "to the extent that it pertained to firemen washing personal automobiles while not on duty"—because of its finding that the "City unilaterally adopted the Order, without giving notice to, or meeting and conferring with, the Union."

Before an analysis of the applicable Government Code sections (3504.5 and 3505), we briefly review the relevant facts surrounding the adoption of the order. The trial court found that on August 9, 1976, and August 16, 1976, the city council "unilaterally prohibited maintenance of personal property with City property."

The order in question was adopted as a recommendation by the finance committee on August 9, 1976. The city council adopted the order on August 17, 1976. (See fn. 1, *ante*.) The Union was not notified, either orally or in writing, prior to August 17, 1976, that the city council

would discuss and/or adopt the finance committee's recommendation of August 9, 1976.

On August 19, 1976, the city council posted the minutes of the August 9 and August 17 meetings on all fire department bulletin boards. On August 30, 1976, the Union president wrote a letter to the city council requesting the latter to reconsider the action, registering his opposition to the order. Then, on September 14, 1976, he appeared before the city council and again requested that they reconsider the order; the August 30 letter was also read to the council at this time. At this meeting the president of the Union also stated to the council "that the problem that led to the adoption of the car wash order should be resolved by negotiation rather than by the council's unilateral action." He told the council that firemen, being 24-hour shift workers, had been allowed this privilege since at least 1941 but "none of the Council members responded to [his] statement." The mayor referred the matter back to the finance committee and on October 12, 1976, the latter decided not to change its position regarding the order. And, finally, on October 19, 1976, the fire chief posted a memorandum stating that on the same day the city council had agreed to allow firemen to wash off their automobile windows before going off duty during the early morning hours because of the danger from heavy dew. This action was also taken unilaterally, though apparently partially in response to previous protests made by the Union president to the fire chief.

In accordance with these facts, the City contends that it satisfied the "meet and confer" requirements of the MMBA, and, if not, it argues that at a minimum the same facts show that the Union waived its right to meet and confer over the disciplinary rule.

In response, the Union argues that the facts clearly indicate that the City did not "meet and confer in good faith," as required by section 3505 of the Government Code, and, furthermore, on cross-appeal, asserts that the trial court erred in holding that the order was void only "to the extent that it pertained to firemen washing personal automobiles while not on duty;" contending instead that unilateral actions are void in their entirety for procedural violation of section 3505. We agree.

As mentioned earlier, section 3504.5, Government Code, requires the City to give "reasonable written notice" to the Union, of any *proposed* legislative action "directly relating to matters within the scope of repre-

sentation." Section 3505 further requires the City to "meet and confer in good faith" with representatives of the Union over mandatory negotiable matters. Section 3505 defines "meet and confer in good faith" as both parties having "the mutual obligation personally to meet and confer promptly upon request by either party and continue for a reasonable period of time in order to exchange freely information, opinions, and proposals and to endeavor to reach agreement on matters within the scope of representation. . . . " The final sentence of this section states that the aforementioned process "should include adequate time for the resolution of impasses where specific procedures for such resolution are contained in local rule, regulation, or ordinance, or when. . .utilized by mutual consent."

■ The rule in California is well settled: a city's unilateral change in a matter within the scope of representation is a per se violation of the duty to meet and confer in good faith. "[T]he courts have not been reluctant to intervene 'when a public agency has taken unilateral action without bargaining at all. In such situations, courts have been quite zealous in condemning the unilateral action and in granting appropriate relief.'" (*International Assn. of Fire Fighters Union* v. *City of Pleasanton, supra*, 56 Cal.App.3d 959, 967, quoting Grodin, *Public Employee Bargaining in California: The Meyers-Milias-Brown Act in the Courts* (1972) 23 Hastings L.J. 719, 753-754 (hereinafter Grodin, *Public Employee Bargaining in California*).)

As respondent rightly contends in its cross-appeal, "the employer's *fait accompli* thereafter makes impossible the give and take that are the essence of labor negotiations."[20] Moreover, to allow another construction would be at direct odds with the purpose of the MMBA, which is "to promote full communication between public employers and their employees."[21]

---

[20]The standard for the conduct of good faith negotiations within the meaning of the term as used in section 3505 corresponds to that in the private sector, and was stated by the Court of Appeal as follows: "In general, good faith is a subjective attitude and requires a genuine desire to reach agreement (*N.L.R.B.* v. *MacMillan Ring-Free Oil Co.* [1968] 394 F.2d 26. . .). The parties must make a serious attempt to resolve differences and reach a common ground (*Labor Board* v. *Insurance Agents* [1960] 361 U.S. 477, 485.) The effort required is inconsistent with a 'predetermined resolve not to budge from an initial position.' (*Labor Board* v. *Truitt Mfg. Co.* [1956] 351 U.S. 149, 154). . ." (*Placentia Fire Fighters* v. *City of Placentia* (1976) 57 Cal.App.3d 9, 25-26 [129 Cal.Rptr. 126].)

[21]The California Legislature left no room for doubt that its "meet and confer" requirement meant prior to the adoption of the proposed ordinance or rule. In 1968,

Despite the aforementioned cases appellant contends that it did not violate the meet and confer provision of the MMBA because the record "shows that there was no malice or bad faith by the City." This contention misstates the law.

In a case alleging violation of the duty "to bargain collectively" imposed by section 8 (a)(5) of the NLRA (see fn. 12, *ante*, at p. 815) the United States Supreme Court held that "an employer's unilateral change in conditions of employment" was a violation of the above duty, even "though the employer [had] every desire to reach agreement with the union upon an over-all collective agreement and earnestly and in all good faith bargain[ed] to that end." (*Labor Board* v. *Katz* (1962) 369 U.S. 736, 742-743 [8 L.Ed.2d 230, 235-236, 82 S.Ct. 1107].)

Accordingly, we find no merit in appellant-City's contention that it did not violate the meet and confer provision of the MMBA because the record "shows that there was no malice or bad faith by the City."

In accord with the Supreme Court's position in *Katz, supra*, California courts have adopted the private sector view that unilateral action constitutes a per se violation of the MMBA, and must therefore be set aside until the "meet and confer in good faith" duty has been met by the employer. (*Huntington Beach Police Officer's Assn.* v. *City of Huntington Beach* (1976) 58 Cal.App.3d 492 [129 Cal.Rptr. 893]; *International Assn. of Fire Fighters Union* v. *City of Pleasanton, supra*, 56 Cal.App.3d 959, 979. See also *Electri-Flex Company* (1977) 228 N.L.R.B. 847.)

In like manner, we agree with the Union's contention on cross-appeal—that the trial court erred in limiting the scope of its ruling so as to void the order only to the extent that it prohibited the washing of firemen's automobiles while off duty—and instead hold that the entire order, being the result of unilateral actions undertaken by the City is void, for procedural violation of section 3505 of the MMBA.

---

when section 3505 was amended to require meeting and conferring in good faith, the Legislature retained from the Brown Act, *ante*, at page 824, footnote 6, the additional obligation on the part of the public agency to "consider fully such presentations as are made by the employee organization on behalf of its members *prior to arriving at a determination of policy or course of action.*" (Italics added.)

## III.

■ Unilateral adoption of the rule in question, without prior notice to the Union, negates the City's contention that the latter waived its right to meet and confer.

The City argues, however, that the Union waived its right to meet and confer. This contention is based upon the fact that the Union "became aware of the disciplinary rule...some time shortly after its adoption [in that the Fire Chief posted the minutes of the August 17, 1976 meeting of the City Council, wherein the rule was adopted, and] [n]otwithstanding said knowledge, petitioners never requested meeting and consulting over the matter."

In support of its position, the City cites cases from other jurisdictions which have held that a unilateral change of condition of employment is not unlawful if the union had an opportunity to bargain. (See *N.L.R.B.* v. *Cone Mills Corporation* (4th Cir. 1967) 373 F.2d 595; *City of Norwich* v. *Norwich Fire Fighters* (1977) 173 Conn. 210 [377 A.2d 290].) The Union in the instant case had no notice—actual or constructive— prior to the City's adoption of the rule in question. A party cannot be said to have waived that which it was never offered.

Also, the appellant-City improperly raises the affirmative defense of waiver for the first time on appeal. (See 3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, § 945, p. 2525; *Wienke* v. *Smith* (1918) 179 Cal. 220 [176 P. 42]; *Fontana* v. *Upp* (1954) 128 Cal.App.2d 205 [275 P.2d 164]). In summation, the Union had no duty to request to meet and confer prior to the adoption of the rule because it had no notice (a factual impossibility is never grounds for imposition of a legal duty); in like manner, there was no duty subsequent to the unilateral adoption because that process itself rendered the rule a nullity due to procedural violations of the MMBA.

## IV.

■ The Union was not required to exhaust administrative remedies which are inapplicable and futile.

Finally, appellant-City contends that the Union's failure to exhaust the grievance procedure set forth in the "Memorandum of Understand-

ing" (hereinafter MOU),[22] or to pursue the remedy provided by "Employer-Employee Resolution 4027,"[23] precluded the court from granting the judicial relief sought. We find no merit in this contention.[24]

It is an established rule that administrative remedies need not be exhausted where they are inadequate, inapplicable, or futile. (*Glendale City Employees' Assn., Inc.* v. *City of Glendale* (1975) 15 Cal.3d 328, 343 [124 Cal.Rptr. 513, 540 P.2d 609]; *Huntington Beach Police Officers' Assn.* v. *City of Huntington Beach* (1976) 58 Cal.App.3d 492, 496 [129 Cal.Rptr. 893]; *Sunnyvale Public Safety Officers Assn.* v. *City of Sunnyvale* (1976) 55 Cal.App.3d 732, 735 [127 Cal.Rptr. 863].)

The grievance provision found in the MOU provides for a four-step procedure commencing with an oral complaint by the employee to his immediate superior and culminating in a hearing before the city council if the grievance is not settled at one of the lower steps. The MOU defines a "grievance" as "a dispute arising out of the interpretation or application of any provision of this Memorandum of Understanding or any Ordinance, Resolution or written policy of Vernon . . . but excluding any and all provisions of Resolution 4027."

The inapplicability of this procedure to the facts in the instant case is manifest. We are not dealing with a "grievance" as defined in the MOU. The key issue here is not the "interpretation or application" of the disciplinary rule, but rather the City's obligation, pursuant to the MMBA, in its enactment of that rule. The rule was void for procedural violation of the above, and, therefore subject to neither interpretation nor application.

---

[22]Titled "Memorandum of Understanding Between the Municipal Employee Relations Representative of the City of Vernon and Vernon Fire Fighters Local 2312," and entered into by the parties pursuant to Government Code, section 3505.1.

[23]"Employer-Employee Relations Resolution of the City of Vernon" section 4027, *supra*, at pages 813-814 of this opinion.

[24]In support of its argument that respondent failed to exhaust its administrative remedies, City cites *Mestnik* v. *City of Atwater* (5 Civ. 3198), noting that therein "the Court . . . held as a matter of law that a disciplined employee was barred by her failure to exhaust administrative remedies." *Mestnik*, however, was granted a rehearing, and subsequently filed but not certified for publication.

Turning now to the remedy prescribed by section 6(E) of resolution 4027,[25] again, by definition, it is inapplicable to the procedural facts of the City's unilateral adoption and its repeated subsequent unwillingness to discuss the rule with the Union's representative. The procedure prescribed by section 6(E) comes into operation when "a dispute over the scope of representation or as to whether a matter is subject to meeting and conferring in good faith" arises, and the parties "do not voluntarily resolve such dispute." It is only in the above situation that the issue is then to be submitted to the city attorney "who shall make recommendations to the City Council for its final determination."

First, such an "unresolvable dispute" never arose in the instant case. Government Code section 3505, in reference to local procedures supplementing its provisions, states that the meet and confer process which it defines "should include adequate time for the resolution of *impasses* where specific procedures for such resolution are contained in local rule, regulation or ordinance, . . ." (Italics added.) The word "impasse" clarifies the meaning of the term "unresolvable dispute," as used in section 6(E), and highlights the inapplicability of that section to the facts before us.

A "genuine impasse in negotiations" is found where "despite the parties best efforts to achieve an agreement, neither party is willing to move from its respective position." (*Dust-Tex Service, Inc.* (1974) 214 N.L.R.B. 398, 405.) There was no such dispute in the case at bench. The language of section 6(E) itself belies its inapplicability. We have before us a rule that has already been adopted. This is not a "matter" under consideration by the city council, let alone one over which the parties have reached an "unresolvable dispute." We also note that the remedy contained in section 6(E) is submission to the city attorney "who shall make recommendations to the City Council *for its final determination.*" (Italics added.) The applicability of this procedure clearly presupposes the council's not yet having enacted the rule, e.g., not having yet reached its "final determination."

---

[25]Section 6(E) of resolution 4027 states that "[i]n the event there is a dispute over the scope of representation or as to whether a matter is subject to meeting and conferring in good faith and the parties do not voluntarily resolve such dispute, the issue shall be submitted to the Attorney for the City who shall make recommendations to the City Council for its final determination."

Upon the unique facts and procedural posture of the case at bar—the City's unilateral adoption of the rule, without prior notice to the Union, coupled with a record that shows a subsequent recalcitrant position offering no opportunity to the Union to meet and confer—the contention that the Union failed to pursue the course of action prescribed by Section 6(E) must be rejected.

Moreover, a thorough review of the record reveals that further pursuit of the section 6(E) remedy would have been futile; for the city council had on more than one occasion manifested its belief that its adoption of the rule was a management prerogative, clearly falling within its "exclusive right to manage and direct the performance of City services and the work force performing such services...[and more specifically, its exclusive right to] establish reasonable work and safety rules and regulations...." (Resolution 4027: Section 5. Statement of Purpose: Section 5(P). City Responsibilities and Rights.) "Where an administrative agency has made it clear what its ruling would be, idle pursuit of further administrative remedies is not required...." (*Huntington Beach Police Officers' Assn.* v. *City of Huntington Beach, supra,* 58 Cal.App.3d 492, 499.)

Thus, the trial court's finding that exhaustion of the administrative remedies allegedly involved in the case at bar was not required, because they were "inapplicable, inadequate, and futile," is both a correct interpretation of the law and amply supported by the record.

In summary, we find that the rule, being unilaterally adopted by the City without prior notice to or meeting and conferring with the Union, was void in its entirety for procedural violation of Government Code section 3505.

The cause is remanded with directions to the trial court to modify the writ in accordance with the views expressed herein.

Affirmed in part and reversed in part with directions. Each party is to bear its own costs.

Kaus, P. J., and Hastings, J., concurred.