[No. A021279. First Dist., Div. Five. Oct. 12, 1984.]

AMERICAN FEDERATION OF STATE, COUNTY AND
MUNICIPAL EMPLOYEES, LOCAL 101, et al.,
Plaintiffs and Respondents, v.
CITY OF SANTA CLARA, Defendant and Appellant.

COUNSEL

Edwin J. Moore, City Attorney, Michael R. Downey and Barry F. McCarthy, Assistant City Attorneys, for Defendant and Appellant.

Tom Dalzell, Joseph R. Colton and True, Wetzel, Colton, Fouts & Ogulnik for Plaintiffs and Respondents.

OPINION

**LOW, P. J.**—Defendant City of Santa Clara (city) appeals from a writ of mandate ordering it to vacate its resolution reducing wages for city workers

involved in the Barricade Monitor Program; to reimburse those city employees for the losses suffered from the reduction; and to meet and confer with plaintiff unions. The city contends that the wholly voluntary Barricade Monitor Program was outside the scope of representation of the employees' unions and not subject to the meet and confer requirement of Government Code section 3505. We affirm.

The city's major thoroughfare, El Camino Real, had become congested by the local youths "cruising" the street in their cars Friday and Saturday nights. The loitering and cruising problem became too great a burden for the city's police force to control without depleting manpower needed for other assignments. In July 1980, in an attempt to relieve the overburdened police force, the city council instituted the Barricade Monitor Program as a temporary measure. On Friday and Saturday nights, between 9 p.m. and 3 a.m., police set up barricades along El Camino Real to discourage cruising and loitering. Volunteers were enlisted from among the city's employees (except police officers and fire fighters) to monitor the barricades during the night.

It was the duty of the volunteers to assist in setting up the barricades, to watch for violations, and to note the license numbers of cars which ignored the barriers. At no time would these monitors interfere with the drivers of the cars or otherwise enforce the barricades. During the night, these monitors were free to read, watch television or talk to friends.

Except as noted above, the program was open to any city employee. No training or particular skill was required or needed. Any interested, eligible city employee need only to report to the police department at 9 p.m. on the night he/she wished to work, and flashlights and other equipment would be provided. Each monitor would perform the same job regardless of his/her official rank and regular position with the city.

At first, the employees were compensated according to the overtime schedule they would receive in their regular city position, consistent with the "Memorandum of Understanding" in effect between the city and the employees' union. For example, an equipment operator for the city would be compensated at an overtime rate of $18.23 per hour, while a lineman would receive his regular overtime pay of $23.28 per hour. Thus, for doing the same job, city employees in different classifications would receive disparate compensation.

The program proceeded in this fashion until March 16, 1982. Due to the high cost of funding this program, the city council held hearings on a res-

olution to reduce the compensation to a flat overtime rate of $10 per hour for all monitors, regardless of their job classification. Plaintiff unions, International Brotherhood of Electrical Workers (IBEW) and American Federation of State, County and Municipal Employees (AFSCME), appeared by their representatives and objected to the wage reduction, arguing that their members would sustain a large loss in income if the program were changed. They argued that this change affected wages and working conditions within the "scope of representation" of the unions as defined by Government Code section 3504, and that these changes could only occur once the city complied with the "meet and confer" provisions imposed upon the city by the Meyers-Milias-Brown Act (Gov. Code, § 3500 et seq.) and in the "Memorandum of Understanding."

The city council rejected that argument and passed the resolution imposing a flat $10 rate; the employees' unions petitioned the superior court for a writ of mandate. The court granted the writ ordering the city to set aside the new wage limit, to meet and confer with the unions, and to compensate the employees for wages they should have received under the former practice.

■ In support of its contention that the Barricade Monitor Program was not a subject for collective bargaining, the city asserts that the program did not affect "wages, hours, and other terms and conditions of employment" as that phrase is defined in the act. Specifically, the city argues that the program had none of the incidents normally associated with city employment; the program was wholly voluntary; it was open to any city employee (except fire fighters and police officers); it bore no relation to the monitors' usual job activities; no training or special skill was required; and the program was only a temporary measure.

■ The obligation to meet and confer extends to all matters within the unions' "scope of representation," which is defined as "employment conditions . . . including, but not limited to, wages, hours, and other terms and conditions of employment . . . ." (Gov. Code, §§ 3504, 3505.) That phrase has been broadly interpreted to foster the stated policy favoring peaceful resolution of employment disputes by means of arbitration. (*Fire Fighters Union* v. *City of Vallejo* (1974) 12 Cal.3d 608, 622 [116 Cal.Rptr. 507, 526 P.2d 971]; *Vernon Fire Fighters* v. *City of Vernon* (1980) 107 Cal.App.3d 802, 811 [165 Cal.Rptr. 908].)

■ This matter falls within that stated policy. The cruise control program was a city-sponsored program which benefited directly and exclusively the city employees who volunteered to participate. That the program was

wholly voluntary does not immunize the city from the Meyers-Milias-Brown Act or minimize the impact of the city council's resolution on the employees' earning capacity. (See *Dublin Professional Fire Fighters, Local 1885* v. *Valley Community Services Dist.* (1975) 45 Cal.App.3d 116 [119 Cal.Rptr. 182].) There, the union successfully sued the district to meet and confer over a new policy requiring the use of temporary employees for overtime work. In the past, permanent employees had priority for overtime assignments. The court held that depriving the permanent employees of their customary priority in seeking such work has an obvious effect on their salaries. Although the decision to work overtime was a voluntary one, the court held that this was a proper subject for negotiation. (*Id.*, at p. 119.)

By establishing a program of overtime work which drew exclusively from the ranks of the city employees, the city could not reduce the compensation without first considering the impact such an action would have on the wages of the volunteer monitors. This is one of the express purposes of the Meyers-Milias-Brown Act.

The city's policy of employing city workers and compensating them at their regular overtime rate, although at first seemingly fair, turned out to be an unwise decision. It may have even violated the principle of "equal pay for equal work." What undoubtedly was intended as a cost-saving measure quickly turned into an extravagant and unsound fiscal dilemma. It is not surprising that the city sought to cut its losses and to find a more affordable "cruise control" program. While such an action may be necessary in this era of scarce, decreasing government revenues, the city could not, consistent with the Meyers-Milias-Brown Act, unilaterally reduce the compensation without first meeting and conferring with the authorized union representatives.

The judgment issuing the writ of mandate is affirmed.

King, J., and Haning, J., concurred.